1818.

M'MENOMY
v.
MURRAY.

</div>

<div style="text-align:center">

Bill dismissed, with costs.

</div>

---

M'MENOMY, *survivor of* TOWNSEND, *assignee of* MARK AND
SPEYER, Bankrupts, *against* MURRAY and others.

*M. & S.* partners in trade, being greatly indebted in the *United States*, and in
*Europe*, on the 2d of *December*, 1799, conveyed certain lands to *B.*, in *trust*,
for the security and payment of certain *European* or *German* creditors, un-
til they were paid, or *S.* should be absolutely exonerated and discharged
therefrom, by the said creditors, and their demands transferred to *M.* alone,
or *S.* be otherwise exonerated, acquitted or discharged therefrom; and after
the said debts should be satisfied, or the said *S.* be so discharged and re-
leased, then in trust for *M. M. & S.* having committed an act of bankruptcy,
in *July*, 1800, were duly discharged from their debts under the late bank-
rupt law of the *United States*, passed *April* 4th, 1800. *Held*, that this was
a valid deed, and that the discharge of *S.* from the partnership debts, under
the bankrupt law, was not a fulfilment of the condition on which the trust
for the *German* creditors was created.

A discharge under a bankrupt law of this country, does not discharge the
debtor from debts contracted, and made payable in *Europe*, or a foreign
country, unless the foreign creditors come in, and prove their debts under
the commission. But even if the discharge under the bankrupt law should

be deemed a discharge from any *suit* in the *United States* for debts due to the *German* creditors of *S.*, yet that would not satisfy the terms and conditions of the peed of trust, unless it, also, operated as a discharge in *Germany*, where the debts were contracted.

The late bankprupt law did not operate upon acts, declared to be acts of bankruptcy, committed prior to the 1st of *June*, 1800.

*July 9th, 11th, and Sept. 28th.*

JACOB MARK, and *John Speyer*, (defendants,) in 1793, entered into copartnership in the city of *New-York*. In 1794, *S.* went to *Europe*, on business, and while there, borrowed of *Engels*, of *Berlin*, 10,400 dollars, for which he gave a partnership note, payable with interest, at 8 per cent., which the bill charged to be usurious. About the 1st of *February*, 1796, he entered into a contract with three *Germans*, Count de *Rottenham*, Baron de *Weekman*, and *F. Mark*, for the sale of 100,000 acres of land of *M. & S.* on a loan by them of 40,000 dollars to *M. & S.* for which he gave an obligation, binding *M. & S.* to pay that sum, with interest, at 5 per cent. on the loan, and a commission of two per cent., the particulars of which contract were stated in the pleadings. *S.* returned to *New-York* in 1796; and the bill stated, that *M. & S.* being indebted above 230,000 dollars, were declared bankrupts, in *July*, 1800, and their estate assigned to the plaintiffs, in *September* following; that they, in contemplation of such bankruptcy, and with intent to defeat and delay their creditors, executed a deed to *John Murray*, defendant, dated 2d of *December*, 1799, which stated, that *M. & S.* had dissolved their partnership on the 5th of *August*, 1799, and that *M.* had agreed to pay the partnership debts, and that *S.* was to be exonerated from the *German* debts, which were specified; the deed further recited the loan of 40,000 dollars, of the three *Germans* above named, and the terms of it, and the security they were to have for the loan, in lands; and to indemnify *S.* from those debts, and to secure the *German* creditors, if they would discharge *S.*, or accept payment in land, at two dollars per acre, *M.*, in whom the

legal title to the lands was vested, and *S.*, conveyed to *Murray*, in fee, fourteen undivided fifteenth parts of township No. **5.**, in the old military towns, on the west side of *Lake Champlain*, containing about 64,000 acres, (subject to a mortgage to *J. & R. Leroy*, to secure 1,600 dollars, and all other specific liens,) *in trust*, for the said *German* creditors, and on condition that those creditors should elect to discharge *S.*, and look solely to *M.*, or to receive payment in said lands, at two dollars per acre, and should give the trustee notice of such election, on or before the 1st of *January*, 1801. The trustee was to hold the land, until *S.* should be exonerated, and for his indemnity, and was authorized to sell the lands at auction, or private sale but not under two dollars per acre, without the consent of *M. & S.* The trustee was, also, authorized to lease the lands ; and after the said debts should be satisfied, or *S.* discharged, he was to hold them in *trust for M.* in fee. The trustee was also authorized to raise money by mortgage, to make partition, and to vest the proceeds of the land in stock of the *United States*, and with power to appoint *M.*, and his assigns, as agent to sell or lease the lands. That in case the trustee died, his son *John R. Murray* was to be trustee with like powers ; if not, then the trustee might appoint a trustee by deed, to be agreed on by him and *M.*, and the creditors ; and the trustee was to convey the lands to the new trustee so appointed ; and *M.* was to free the lands from all incumbrances, and pay the taxes ; and on the further condition, that if the debts or any part of them should be paid by *M.*, or if *S.* should be discharged from his debts the deed should be void.

The bill further stated, that *S.*, about the 1st of *June*, 1800, in contemplation of bankruptcy, or of a discharge under the insolvent act, conveyed to the defendant, *Murray*, one or more lots in the city of *New-York*, without any consideration. That the deeds were delivered to the defendant *Murray*, long after the time they bear date ; and

1818.

M'MENOMY
v.
MURRAY.

the first mentioned deed had not been recorded as a mort-gage in the county where the lands were situated, at least, before the commission of bankruptcy on the 1st of *April*, 1800, when a judgment was docketted against *M. & S.* at the suit of the plaintiffs and others, for 100,000 dollars in trust for the creditors of *M. & S.* who have proved their debts under a commission of bankruptcy. That none of the *German* creditors had elected to discharge *S.*, and look solely to *M.*, or to receive payment in lands, at two dollars per acre, nor given notice of such election to the defendant *Murray*, before *M. & S.* were discharged under the bankrupt act in *October*, 1800, or before the 1st of *January*, 1801, whereby the *condition* on which the security was provided for their *German* creditors was not complied with, and the deed became void. The bill charged, that if this deed was otherwise valid, it was fraud-ulent as against the general creditors of *M. & S.*; and prayed, that the defendant *Murray*, might render an ac-count of receipts and expenditures, under the deeds, &c.; and deliver up the same to be cancelled or be decreed to release the said lands and lots to the plaintiffs, and come to an account of all moneys received thereon, &c. &c.

The defendants, *Murray*, *Mark*, and *Speyer*, in their joint and several answers, set forth all the particulars of the transactions, &c. referred to in the bill.

It was agreed by the counsel of the parties, that an ac-count should be taken of the debts due to the *German* cre-ditors as stated in the answer, if they were entitled un-der the trust deed to be paid their debts. That suits were pending against *M.* and *S.* between *January* and *April*, 1800, and that in *March*, 1800, verdicts were taken against them, and judgments entered thereon at the ensuing term of the Supreme Court. That the trust deed was prepared in *December*, 1799, by direction of *Marks*, and was duly executed and delivered the 24th of *January*,

1800; that *M.* and *S.* committed an act of bankruptcy the 11th of *July*, 1800.

*N. Pendleton,* for the plaintiff. He cited *M'Menomy* and *Townsend,* assignees of *Mark* and *Speyer* v. *Ferrers,* (3 *Johns. Rep.* 71.) *Herman* v. *Fisher,* (*Cowp.* 117.) *Anderson and others* v. *Temple,* (4 *Burr.* 2235.) *Hyslop and another* v. *Clarke and others,* (14 *Johns. Rep.* 458.)

*S. Jones,* jun. and *E. H. Pendleton,* for the defendant.

The cause stood over for consideration until this day. *September 28th.*

THE CHANCELLOR. The great object of the bill is to set aside the deed of trust of the 2d of *December,* 1799, from *Mark & Speyer* to *John Murray,* and the deed of the 21st of *April,* 1800, from *Speyer* to *Murray.*

1. The trust deed was made to secure the *German* creditors several of whom made a loan to *Mark & Speyer,* upon the condition that they should be secured by lands in the *United States.*

One of the objections to this deed is, that it was made upon a condition which has since been fulfilled, which was the discharge of *Speyer* from the partnership debts. This condition is repeatedly expressed in the deed. The lands mentioned in it were conveyed in trust, for the security and payment of *European* creditors, until the debts were paid, or *Speyer* should be "otherwise exonerated, acquitted, and discharged therefrom." The manner in which *Speyer* was to be discharged is afterwards mentioned. It was to be done by the act of the creditors, transferring their demands from the house of *Mark & Speyer* to *Mark* alone, so as thereby to exonerate *Speyer.* It is, again and again, declared and repeated, that the *German* creditors were to exonerate *S.* "so as the said creditors could not thereafter claim, challenge, or recover the debt or any part of it, from him;" or so that he

"be thereof and from the responsibility to pay, fully acquitted, exonerated, and *released.*" In a subsequent place in the deed, it is once more mentioned, that when the *European* debts were all discharged and paid, or when *Speyer* "should be wholly and absolutely exonerated, acquitted, and perpetually exempted of and from all and singular the said debts, dues, and demands, and of and from all manner of liability for the payment thereof, *by any of the means aforesaid*, or by good and sufficient transfers by the said creditors of such their said debts to *Mark*, so as to acquit *Speyer*," then the trust estate was to cease.

There can be no doubt in the mind of any person who will carefully peruse the deed of trust, that the discharge of *Speyer* was to come from the *German* creditors, and to be a personal act of theirs, and no other means of discharge were within the purview of the deed. No such discharge is pretended, and, therefore, the deed remains in force. But it has been urged, that the discharge of *Mark & Speyer* in *October*, 1800, under the bankrupt act of the *United States*, was a discharge from the *German* debts, within the condition of the deed. It is a decisive answer to this objection, that the parties did not mean such a discharge, and that the deed must have operation according to the manifest intent. Nor did the discharge of *Speyer*, under the bankrupt act, fully and perpetually exempt him from the *German* debts. These debts were contracted in *Germany*, and payable in *Germany*, and the discharge of *Speyer* by the bankrupt law of this country will not discharge him from those debts, unless those foreign creditors have assented to that proceeding, by coming in and proving their debts under the commission. I am aware that the opinion has respectable sanction; that "a *cessio bonorum*, under the laws of a state where the debtor has his permanent domicil, ought to operate as a discharge from his creditors in every part of the world." But such a general rule as this is not the law of the

land, nor do I believe it to be any part of the *jus gentium*. There are several distinctions taken on this subject, and which I need not now examine. It is sufficient to say, that a contract made in a foreign country, and to be governed and discharged by its laws, cannot be "absolutely" discharged by the statute of another country, to which the parties have not bound themselves to submit. A bankrupt or insolvent act ought not to be presumed to have been intended to reach foreign contracts, unless it be so declared. If *Speyer* was to be deemed discharged for any suit here, within the *United States*, for the *German* debts, by force of his discharge under the bankrupt act, (and this is a point which I am not willing to concede without further consideration,) yet that would not satisfy the terms of the deed of trust, unless the discharge here would operate as a discharge in *Germany*, where the debts were contracted. He must be "wholly and absolutely and perpetually discharged from all manner of liability for the payment of those debts;" and can we say, or can we believe, that if *Speyer* had returned to his native *German* country, where his father resided, and where the debts were contracted, that he could have pleaded his discharge here in bar of a suit there? It does not appear in what part of *Germany* the debts were contracted; but we know, that in several parts of it there is no such thing as a debtor's discharge by the assignment of his property. *Huberus* says, (*Prælec.* tom. 2 1454.) that *secundum jus nostrum, cessio bonorum invitis creditoribus, debitorem a carcere publico non liberat.* The law is the same in other parts of *Germany*. *Non ubivis tamen locorum hoc beneficium,* (says *Heineccius,* when speaking of the *cessio bonorum,*) *indulgetur obæratis. Cessat sane* in Saxonia *electorali, ubi debitores nihilominus, urgentibus creditoribus, detruduntur in carcerem.—Jure Lubecensi, debitor, qui non solvendo est, adjudicatur creditori sed ita, ut quotidiana operæ debitum minuant. Heinec. Elem. Jur. Civil. Secund.*

1818.

M'MENOMY
v.
MURRAY.

*Ord. Pand.* part 6. lib. 42. tit.* 3. *De Cessione Bono rum,* s. 254.) *In* Saxonia—*Debitoribus non concesso flebili cessionis bonorum beneficio.* (*Heinec. Elem. Jus. Germaniæ,* lib. 2. tit. 13. s. 387.) And is it not very improbable, that in the *German* states, where the indefeasible obligation of debts is so strongly maintained, they would suffer their policy to be subverted, and their subjects defeated in their remedy at home, by the bankrupt or insolvent laws of foreign countries? We have said, that we would not suffer such a control; (*Van Raugh* v. *Van Arsdale,* 3 *Caines,* 154.) and the same rule prevails in other states; (1 *Mass. Rep.* 198. 3 *Day's Rep.* 82. 3 *Binney,* 201. 5 *Binney,* 385.) and in *England.* (*Smith* v. *Buchanan,* 1 *East,* 6.) It has also been decided in one of the circuit courts of the *United States,* (*Van Reimsdyk* v. *Kane,* 1 *Gall.* 371.) that a discharge under an insolvent act here, is no discharge of a contract made and to be executed abroad.

I am satisfied, upon the whole, that there is no weight in this objection.

Another objection taken to the force of this trust deed, is, that it was to be considered a mortgage, and ought to have been registered, to give it effect against the subsequent assignment of *Mark* & *Speyer.*

The answer to this is, that the deed speaks for itself, and appears, most obviously, to be a conveyance in trust for the benefit of the *German* creditors; and it would be absurd to bring such an instrument, creating such very special and complicated trusts, within the meaning of the registry act. That act relates only to simple conveyances by way of mortgage for the payment of money, at certain definite periods, and the provisions in it as to the registry and discharge of mortgages, have no application to this deed. It is true, that some of the provisions in the deed speak of part of the *German* creditors as being, in certain events, special mortgagees or conditional owners, but those words cannot

change the nature of the instrument, and turn the trustee into a mortgagee. They were no more than what the rules of equity would have implied, that the trust was to continue, and the equitable interests of the creditors to remain, until the objects of the trust were fulfilled, and no longer.

But if it was a mortgage, the assignees had notice of it. In the examination of *Mark* before the bankrupt commissioners, he gave, in his schedule marked A, an account of all his lands, in which it was stated, that the 61,414 acres in township No. 5, and embraced by the trust deed, were conveyed to *Murray, in trust for a number of German creditors, and was made in December or January preceding ;* and in another exhibit, he stated those lands to be *incumbered by a mortgage to Le Roy & Son, and for the security of debts owing in Germany, amounting to* 100,000 dollars. The two assignees appeared and proved their debts, and the assignment to them must have contained or referred to the schedules of their debts. The mention of the trust deed in these schedules, on which the assignment was founded, was sufficient notice to supply the place of the registry, and to give it operation prior to the assignment under the bankrupt commission. This was at least a notice of equal certainty, and ought to be of equal effect, with the one admitted to be sufficient by the Court of Errors, in their decision in *March* last, in the case of *Dunham* v. *Dey,* (*a*) on appeal from a decree of this court.

It is farther objected to the deed of trust, that it was made to delay, hinder, and defraud creditors, and was consequently, void within the statute of frauds.

There does not appear to me to be the least shadow of foundation for this objection, and I am persuaded the deed was made with upright views, and for just cause.

The loan of 40,000 dollars from Count de *Rottenham,* and the other two *German* creditors, was made upon the express promise of security in *American* lands ; and when

(*a*) Vide 15 *Johns. Rep.* 545.

1818.

M'MENOMY
v.
MURRAY.

*Mark & Speyer* dissolved partnership, on the 5th of *August,* 1799, it was agreed, that *Mark,* in whom was the legal title, was to convey to some person, to be thereafter selected, in trust for the *German* creditors, the lands included in this deed of trust. It is well settled, and it is not in my power to alter the rule, that a debtor may give preferences when no legal lien intervenes, and when it is done fairly, and from honest motives; and the defendants, *M. & S.,* both declare, that they deemed themselves solvent when they made the deed. There is nothing in this case from which any fraud can be inferred, unless it be from the provisions in the deed itself, and on a careful examination of them, I see nothing to support the inference. All the directions and limitations, when taken and compared together, were for the more effectual, safe, and beneficial execution of the trust, and for the interest of the foreign creditors. It is to be observed, that the creditors, for whose benefit the trust was created, were foreigners residing in *Germany,* and who could not take any immediate or useful control of the subject; and it was necessary to make provisions for numerous contingencies which might arise, and which these creditors themselves could not be prepared to meet. I am entirely persuaded of the good faith of *M. & S.* in the creation of the trust, and that the intention was to secure those distant creditors, who had the strongest claims to attention.

I have not thought it necessary to notice the objection made to a want of delivery of the deed to the trustee, for it is extremely obvious, from the answers, that the delivery was to the trustee, and that when it is said, in one place, that the delivery was to *Mark,* it was evidently a mistake. The agreement, signed by the respective counsel, and admitting certain facts to be deemed proved, states, that the deed was duly executed and *delivered* on the 24th of *January,* 1800. The provision in one part of the deed, that the trustee was not to sell below the price of two

dollars an acre, without the consent of *M. & S.*, was qualified with the exception, " unless compelled to sell for a less price by a decree of some court of competent jurisdiction." This was placing the trust, in that particular, under the guidance of this court, and could not have been intended to place in *M. & S.* a control injurious to the creditors. I have no doubt the whole provision was intended for their greater security, considering they were too far removed to exert any personal direction. There was, however, in the latter part of the deed, a general power to sell at public or private sale, on cash or credit, at the discretion of the trustee, without limitation of price.

All the objections to the trust deed appear to me to be destitute of any real force.

2. We are next to consider the validity of the deed of the 21st of *April*, 1800, from *Speyer* to *Murray*, of two lots of land in the city of *New-York*, which belonged exclusively to *Speyer*.

These lots were sold to *Murray* for 500 dollars, for which *Murray* gave his note, which *Speyer* got immediately discounted at one of the banks for his own use. It is denied that this sale was made in contemplation of bankruptcy; but *Murray* admits, that this sale was in trust to pay the surplus, if any, arising on a future sale of the lots, to the order of *Speyer*, who directed it to go to pay a debt due to his father in *Germany*.

There is nothing in this transaction that will warrant us to conclude, that this deed was made in contemplation of bankruptcy, and in fraud of the bankrupt act, which was passed the 4th of *April*, 1800. That act was not to operate upon what were declared to be acts of bankruptcy, except such as were committed after the 1st day of *June* following. This was a fair and *bona fide* sale, and, probably, for a full, if not an enhanced price, and it does not appear that the lots have since been able to produce a surplus, though an effort has been made to sell them.

Upon the whole, my opinion is, that there is no founda-
tion for the bill. It appears, however, to be a part of the
agreement of the counsel, that an account was to be taken
of the *German* debts, if those creditors are deemed to
have a valid security under the trust deed. If the plain-
tiff shall deem such a reference material, he is at liberty
to have it, if he shall so elect, within thirty days, or, other-
wise, the bill will stand dismissed.

<div align="right">Decree accordingly.</div>