1820.

HOLMES
v.
REMSEN.

HOLMES and others *against* REMSEN and others, *Executors* of CLASON.

A debt due by *C.* an *American* citizen, to *M.* a *British* subject resident in *London*, was recovered by foreign attachment, and the judgment of the Mayor's Court of the City of *London*, in due course of law, out of monies which had come into the hands of *C's.* agents in *London;—Held*, that the payment of the debt by the agents of *C.* being compulsory, and by the judgment of a Court of competent jurisdiction, was a bar to a suit brought here to recover the same debt, either by *M.* or by *trustees* of the creditors of *M.* against whom an attachment had been issued here, at the instance of an *American* creditor of *M.* under the act giving relief against absent debtors, previous to such process of foreign attachment abroad.

The succession to and distribution of *personal* property is regulated by the law of the owner's *domicil*, not by the *lex loci rei sitæ.* It is a principle of international law, to take notice of and give effect to the title of *foreign assignees.* And the assignees of a foreign bankrupt may sue here for debts due to the bankrupt's estate, either as such assignees, or in the name of the bankrupt.

An *assignment* by the commissioners of *bankrupts* in *England*, of all the estate and *choses in action* of the bankrupt, passes a *debt* due by a citizen of this state to the *English* bankrupt.

And if such assignment is *prior in time* to an *attachment* of the same debt here, at the instance of an *American* creditor of the bankrupt, issued under the act for relief against *absent debtors, &c.* a subsequent payment of the debt to the foreign assignees in *England*, is a bar to a suit brought by the *trustees* appointed under the act, against the debtor here.

A concurrent separate assignment made by the bankrupt to the same assignees, on the same trusts, though it may strengthen the case before the Court, makes no difference as to the application of the general doctrine.

1820.

HOLMES
v.
REMSEN.

*ISAAC CLASON,* of the City of *New-York,* merchant, died in *February,* 1815, and the defendants are his *executors.* In his life time, he was indebted to *Frederick Mullett,* of *London,* in the sum of 2,665*l.* 1*s.* 10*d.* sterling, being the admitted balance of an account between them. On the 7th of *August,* 1816, a warrant of *attachment* was issued against all the estate, real and personal, &c. of *F. M.* as an absent debtor, under the act for relief against absent and absconding debtors, passed the 27th *March,* 1801 : (24 sess. c. 49. 1 *N. R. L.* 157.) Notice of the attachment was published on the 8th of *August,* 1816 ; and the plaintiffs, on the 27th *August,* 1817, were duly appointed *trustees* for all the creditors of *M.* pursuant to the act, and notice thereof published the next day. The plaintiffs, as *trustees,* demanded of the defendants payment of the said debt, who admitted the demand, and that they had sufficient *assets* to satisfy it, but refused to pay. The plaintiffs having commenced a suit in the Supreme Court against the defendants for the recovery of the debt, the defendants obtained an order on the plaintiffs to exhibit a *bill of the particulars* of their demand ; and the plaintiffs stated their demand to be for the balance of account as above stated, with interest from the 31st *Dec.* 1814, ; but the defendants obtained an order to stay the proceedings at law, until a further bill of particulars should be exhibited, which the plaintiffs stated they were unable to do, as the

*June* 13*th* and *July* 17*th.*

defendants had in their possession all the accounts and vouchers relative to the demand, and the books of *M.* were abroad and out of their power or controul; and that they had in vain applied to the defendants, for an inspection of the books *and accounts* in their possession, as executors.

It was stated in the *answer*, and admitted, that *M.* is a native subject of *England*, and has always resided there, and for the last twenty years has been a merchant in *London*. On the 14th *February*, 1815, after the debt of *Clason* was due and payable, *M.* was duly declared a bankrupt, according to the laws of *England*; and on the same day, an assignment of all his estate and *choses in action* was duly made, by the commissioners of bankrupts, named in the commission issued against him, to *Henry Page*, in trust for the creditors of *M.* On the 25th *February*, 1815, the commissioners and *Henry Page* assigned and conveyed to *Charles Campbell, John Deacon,* and *Ives Hurry*, according to the laws of *England*, all the estate and *choses in action*, (so before assigned to *Henry Page*,) in trust for all the creditors of *M.* On the 26th *February*, 1815, *M.* by deed, in consideration of ten shillings sterling, &c. conveyed and assigned to the said *C. C., J. D.,* and *I. H.,* all the debts, personal estate, and effects whatsoever, of him, the said *M.,* now being, arising, or growing within *England*, which he, the said *M.,* was entitled to, or is possessed of, or which any other person or persons was or were possessed of or entitled to, in trust for him, in *trust* for the same purposes, as mentioned in the former assignments.

In the life time of *Clason,* a ship, called the *Star,* belonging to him, was libelled, and condemned in the Vice Admiralty Court, at *Halifax, Nova Scotia,* and *C.* appealed from the sentence of condemnation to the High Court of Admiralty in *England,* and appointed *Baring, Brothers, & Co.,* his agents, in relation to the appeal. The appeal was pending at the time of *C.'s* death, and the defendants, as his execu-

tors, appointed *Baring, Brothers, & Co.*, their agents in re- lation to the appeal. On the 21st of *May*, 1818, *Baring, Brothers, & Co.*, with the consent and approbation of the defendants, compromised the appeal, and received a large sum of money from the captors, for the use of the defend- ants, as executors of *C.* In *October*, 1818, the assignees of *Mullett*, pursuant to the law and *custom of London*, in the Lord Mayor's Court of that city, exhibited their plaint against the defendants, for the money due from *C.* to *M.*, with interest; and, afterwards, procured an attachment to be issued out of that Court, by virtue of which, 3,167*l.* sterling, being part of the money so received by *Baring, Brothers, & Co.*, for the defendants, was attached in the hands of *Baring, Brothers, & Co.*, and such proceedings were thereupon had, that on the 1st of *December*, 1818, a judgment was rendered in the said Court, pursuant to the law and custom of *London*, that the assignees of *M.* should have execution for 3,024*l.* 1*s.* 6*d.* sterling, of the moneys of the defendants, as executors of *C.*, in the hands of *Baring, Brothers, & Co.*; and in *February*, 1819, the assignees of *M.* had execution for that sum of money, and *Baring, Brothers, & Co.* were compelled to pay that amount to the assignees of *M.*, out of the moneys of the defendants, as executors of *C.*, in their hands.

The plaintiffs, in their bill, *prayed*, that the defendants might be decreed to come to an account with the plaintiffs, respecting the sum due from *C.* to *M.*, and render an account of the assets of *J. C.*, which have come to their hands, and that they produce the accounts, books and papers between *C. & M.*, and be directed to pay to the plaintiffs, the sum which may be due to them as trustees of *M.*, and not actu- ally paid to *M.*, or to his legal representatives, before the 8th of *August*, 1816.

The cause came on to be heard, on the pleadings and proofs.

1820.

HOLMES
v.
REMSEN.

June 13th.

*Caines*, for the plaintiffs. He stated the following points: 1. That the commissioners' assignment under the *English* statute of bankrupts, being merely a statutory transfer under the *municipal* laws and regulations of *Great Britain*, though operative against the bankrupt, and all *British* subjects, all over the world, on the principle of the law of the domicil governing the disposition of personal property, is, notwithstanding, inoperative, null and void, as against an *American* citizen, a creditor of the bankrupt, and residing within the *United States*.

2. That the assignment of the bankrupt himself, being made *eodem fiatu et eodem intuitu* with the commissioners' assignment, is only a part of the same assignment, making together one single conveyance, of which the commissioners' assignment is the principal, is, therefore, subject to the same laws, and follows the fate of the principal assignment. If it be not a part of the same conveyance, it is an act of bankruptcy itself, and void by the law of the country where it was made.

3. That the assignment of the bankrupt, if it stood alone, would be void, as being *in fraudem legis* of the state of *New-York*, and in fraud of *American* creditors, with intent to subject to the distribution of another, and a foreign *forum*, the property in this country to which the *American* creditors gave credit.

4. That the assignment of the bankrupt is void, being a mere voluntary conveyance, under the statute for the prevention of frauds; the trust for the creditors created by it in foreign trustees, making no consideration sufficient to uphold it, as against *American* creditors.

5. That by the law relative to absent and absconding debtors, under which the attachment issued here, all payments by the defendants, on account of the debt due to the absent debtor, after the 8th of *August*, 1816, when notice of its having been issued was published, were made in their own wrong.

6. That the placing in *London*, on the 21st of *May*, 1818, the debt due to the absent debtor, in the hands of *Baring, Brothers, & Co.*, (some of the partners of which house were, also, assignees under the *English* commission,) was, in law, a fraud on the vested rights of the *American* attaching creditor, being, after notice of those rights, collusive and voluntary, in order to subject the fund to the law of attachment of the city of *London*.

7. And, therefore, the subsequent payment, by judgment of the Mayor's Court of *London*, was, in law, fraudulent, collusive and voluntary; and so, constitutes no valid defence to defeat the rights of the *American* creditor residing in *New-York*, under the previous attachment sued and notifie' under the law of this state.

But, should the Court be inclined to dismiss the bill, it ought to be without costs. Plaintiffs suing in *auter droit*, are not responsible for costs, unless under special circumstances. (*Goodrich* v. *Pendleton*, 3 *Johns. Ch. Rep.* 520. 1 *Mad. Ch. Tr.* 173. *Newland's Pr.* 203.) He cited, also, 6 *Binney's Rep.* 353. 5 *East*, 131, 132. *H. Bl. Rep.* 409. 412. 553. *Cranch*, 302. 5 *Cranch* 302

*P. A. Jay*, contra, insisted on the following points:
1. That the assignment under the bankrupt law of *England*, vested in the *English* assignees all the personal estate of the bankrupt, *F. M.*, in this state, as well as in *England;* and, therefore, the right to the money now claimed by the plaintiffs, could not vest in them, by virtue of the *subsequent* proceedings under the act relative to absent debtors.

2. If the personal estate of the bankrupt here, did not vest by the assignment under the bankrupt law of *England*, it passed by the voluntary assignment made by *F. M.*, long previous to the proceedings under the act relative to absent debtors.

3. The defendants having been compelled, by due course of law, to pay the money in question to the assignees in *England*, cannot now be compelled to pay it, also, to the plaintiffs. He cited 4 *Term Rep.* 182. 186. 190. 192. *Dow's Rep.* 170. 1 *East*, 15. 1 *Johns. Cases*, 51. 1 *Johns. Rep.* 118. 2 *Johns. Rep.* 344. 1 *Rose's Bankrupt Cases*, 462. 2 *Rose, B. C.* 99. 284. 315.

THE CHANCELLOR. This is a bill filed by the trustees of *Mullett*, an absent *English* debtor, to compel payment of a debt due to him from the defendants, as executors of *Clason*. The defendants admit the original debt, and assets, and the character of the plaintiffs, as trustees, duly appointed under the act *for relief against absconding and absent debtors*. But they set up in their answer two grounds of defence : (1.) That assets of their testator, in the hands of *Baring, Brothers, & Co. of London*, to the amount of the debt, were attached in the *Lord Mayor's Court* of *London*, at the suit of the assignees of *Mullett*, who had been declared a bankrupt; and that the debt was in that way recovered by judgment and execution, and paid. (2.) That *Mullett* was declared a bankrupt, under the bankrupt laws of *England*; and all his personal estate, and debts, vested in assignees, by assignment, prior to the institution of proceedings in this State, against *Mullett*, as an absent debtor. and that the right to the debt passed thereby to those assignees.

(1.) If the defendants are bound to account to the plaintiffs, as trustees of *Mullett*, for the amount of the debt which their testator, at the time of his death, owed *Mullett*, they will have paid the debt twice. The debt has already been paid to the assignees of *Mullett*, under the process of foreign attachment, and it certainly cannot be recovered back. It was a compulsory payment, under a regular judgment and execution, and to the legally constituted assignees of *Mullett*. There is nothing in the pleadings, or proofs, to support the allegation of the plaintiffs' counsel, that the

*Payment by the garnishee, under a judgment and execution on a foreign atachment, in London, of a debt due by a citizen of New-York, to a creditor in England, is a good bar to an action brought against the debtor here by trustees, under the act giving relief against absentdebtors; though the atachment here issued before the money of the debtor came into the hands of the garnishee, and before the foreign attachment issued in England.*

+ 1 *Dow's*

recovery in *London* was fraudulent and collusive between the defendants and the assignees. The assets were not placed in the hands of the garnishees for any such purpose. It appears from the facts admitted, that the defendants' testator had, in his life-time, a ship libelled and condemned, at *Halifax*, and that he had appealed to the High Court of Admiralty, in *England*, and appointed the house of *Baring, Brothers, & Co.* his agents, in relation to that appeal. This appeal was pending at his death, and his executors continued the agency of it in the house where their testator had placed it. In *May*, 1818, the appeal was settled upon terms approved of by the defendants, and the money due from the captors of the ship paid to the agents; and in *October* following, a portion of this money was attached by the assignees of *Mullett*, for the debt in question. There is no just colour or pretence, from these facts, for saying, that the moneys of the testator were placed in the hands of *Baring, Brothers, & Co.* with any fraudulent views, in respect to the demand of the plaintiffs.

The question now is, whether that recovery of the debt is not a conclusive bar to the claim set up by the bill? In my opinion the question cannot admit of a moment's doubt. The garnishees had no means of retaining the money, so attached, in their hands. The recovery is a good defence to them against any claim, on the part of the defendants. A garnishee can plead the recovery, even though the plaintiff did not prove his debt, and even though the original debtor had not notice, in fact, of the attachment. If the proceedings under the foreign attachment be not void, they constitute a good defence. (*M'Daniel* v. *Hughes*, 3 *East*, 367.) Nor could the defendants, by any means whatever, have repelled the suit in the Lord Mayor's Court. The debt had been acknowledged by their testator, and the title of the assignees was indisputable; and to compel them to pay the debt out of their own monies, or to charge the debt a second time upon the assets of their testator, would, in

either view, be an act of injustice not to be endured. If money be duly attached in the hands of a party, and he has paid it, pursuant to the judgment of a competent foreign Court, I am to presume *omnia rite acta*; and it may be laid down as a clear principle of justice, that a person compelled, by a competent jurisdiction, to pay a debt once, shall not be compelled to pay it over again. The weighty observation of *Lord Bacon*, (*De Aug. Sci. lib.* 8. c. 3. aph. 96.) is perfectly applicable; *ut Curiæ, judicia utrobique reddita (quæ nil ad jurisdictionem pertinent) libenter rescindant, intolerabile malum, et a regibus, aut senatu aut politia, plane vindicandum.* This doctrine was understood, and explicitly declared by the Supreme Court, in *Embree & Collins*, v. *Hanna*, (5 *Johns. Rep.* 101.) where it was stated, that, if a debt had once been recovered of the debtor abroad, under the process of foreign attachment, the recovery was a perfect protection against the original creditor. In the present case, the debtor has been compelled to pay the debt once to his creditor, who called upon him in the character and name of his *English* assignees; and now the debtor is called upon again for the same debt, by the same creditor, in the representative character of his *American* trustees. Which of these representatives would have the

*The title of the foreign assignees, and of the American trustees, being equally valid under the laws of their respective countries, the debt is well paid to the party who has used the greatest legal diligence to recover it.*

better title to the debt, if it were still unpaid, may be one question; but certainly, when the title of the assignees, and of the trustees, is equally valid, under the laws of their respective countries, the debt is well paid to the party that uses the best diligence, and first recovers the debt. In the case of *Embree & Collins*, v. *Hanna*, a prior pending attachment of the debt, in another State, was held to be good, by way of plea, in abatement of a suit by the creditor; and a judgment upon a foreign attachment is held to be a good plea in bar. (*Savage's case*, 1 *Salk.* 294. 5 *Taunton,* 558.)

(2.) That the *English* assignees had a good right to demand, sue for, and recover the debt from the defendants, in the man-

ner they did, cannot be denied. But putting the proceeding under the foreign attachment out of view, the payment of the debt to the assignees of *Mullett*, considered as a voluntary payment, was good; for the entire and exclusive right to the debt, passed by assignment from *Mullett* to his assignees, prior to notice of the attachment issued under our statute. This brings me to consider the other point raised by the case, viz.—whether the plaintiffs have shown any right to the debt, considering that *Mullett* was duly declared a bankrupt, and his personal estate assigned, under the bankrupt law of *England*, prior to the time that proceedings were instituted against him, under our statute, as an absent or absconding debtor? After the best consideration which I have been able to give to this question, it has appeared to me to be a rule of national law, that the proceeding which is prior in point of time, attaches to itself the distribution of the fund. We have no direct decision upon that point, in this State; though in the case of *Bird, Savage & Bird*, v. *Caritat*, (2 *Johns. Rep.* 342.) it was assumed to be " a principle of general practice among nations to admit and give effect to the title of foreign assignees. This was done on the ground, that the conveyance under the bankrupt laws of the country where the owner was domiciled, is equivalent to a voluntary conveyance by the bankrupt; and that the general disposition of personal property by the owner, in one country, will affect it every where; because, in respect to the owner's control over it, personal property has no locality."

That the succession to, and disposition of personal property, is regulated by the law of the owner's domicil, has become a settled principle of international jurisprudence, founded on public convenience and policy. This general principle is amply discussed and illustrated by *Huber*, under the well known title, *de conflictu legum*; and that essay is every where received as containing a doctrine of universal law. *Heineccius* (*De Testamenti factione Jure Germanicc,*

The succession to, and the distribution of, personal property, is regulated by the *lex domicilii*, not by the *lex loci rei sitæ*.

Opinion of *Huber* on this question.

1820.

HOLMES
v.
REMSEN.

The same
principle of
general law
that governs
marriage con-
tracts, testa-
mentary dispo-
sitions, and the
succession to
the personal
estate of intes-
tates, applies
to the distri-
bution of the
estate of a
bankrupt.

s. 30.  *Opera*, tom. 2. 972.) cites that treatise, and the same doctrine in *Strykius*, as the received law in *Germany*.  The same general law' that governs the marriage contract, and testamentary dispositions, and the succession to intestates' personal estates, applies with equal force and convenience to the disposition of bankrupts' effects.  This mutual respect of nations, as *Huber* terms it, or courtesy of international law, is founded on the credit which one country gives to the administration of justice in another, and the adoption of it wonderfully increases reciprocal confidence and credit.  It would seem to be peculiarly beneficial in respect to the property of bankrupts ; for the just and equal distribution of the funds of that class of debtors, becomes the common concern of the commercial world ; and the decisions on that subject now form a code, of what Mr. *Rose* aptly terms " international bankrupt law."  The presumption ought to be, that justice will be well administered in every civilized country ; and in the application of the law to bankrupts, that the foreign creditor sent to the bankrupt's domicil for his dividend, (and the inconvenience of such a resort is not very great, considering the facility and rapidity of commercial correspondence) will obtain the same measure of justice as the other suitors of the country.  It is the presumed will of every person dying intestate, that his moveables, which by fiction of law have no locality independent of his person, should be brought home, and distributed according to the law of his own place.  A different rule, says Lord *Hardwicke*, would be extremely mischievous, and affect the commerce of the country. · So, it is equally to be presumed to be the understanding of the commercial world, that the funds of the bankrupt should be distributed according to the law of the place where he resided, *animo manendi*, and where the credit was bestowed.

It is apprehended, that there would be great inconvenience (and it has been frequently detailed) in allowing coexisting commissions upon a bankrupt's estate, to have con-

current operation, *simul et simul*, in different countries; unless, as Lord *Eldon* observed, the one that is subsequent in point of time, be used merely as the means of assisting the distribution of the funds under the other. It would be in the power of the bankrupt to throw his property under the distribution of either commission, at his pleasure; and it would put creditors upon calculations of exclusive advantages, and of running a race of diligence against each other, and of resorting to the one fund or the other, as circumstances might dictate. The perplexities arising from the concurrent operation of distinct commissions would be increased, if the commercial house had establishments in different countries, with joint and separate debts belonging to each firm, to be distributed. Such a state of things, and such conflicting systems, would lead to great inconvenience and confusion, and be the source of fraud and injustice, and disturb the equality and equity of any bankrupt system.

The principle of international law, in reference to this subject, which appears to be now incorporated into the jurisprudence of every part of the united kingdom of *Great Britain* and *Ireland*, and which is there uniformly asserted (and I presume, upon good authority) to be a reciprocal rule of practice among the other nations of *Europe*, is certainly calculated to remove all collision and discord, and to promote general confidence, harmony and justice. It is a rule of decision, and not a question of jurisdiction, and has no alarming effect whatever upon the rights of territorial sovereignty and independence. It is admitted, in all the cases, that every country may, by positive law, regulate as it pleases, the disposition of personal property found within it, and may prefer its own attaching creditor to any foreign assignee, and no other authority has a right to question the determination, though, as Lord *Loughborough* said, they " must suppose that determination wrong." This was so ruled, also, by Lord *Mansfield*, in *Le Chevalier* v. *Lynch.*

*Margin notes:*

1820.

HOLMES
v.
REMSEN.

Inconvenience of co-existing commissions on the estate of a bankrupt, in concurrent operation in different countries.

The principle of national law on this subject, is a rule of decision, not a question of jurisdiction; and does not affect the rights of territorial sovereignty.

1820.

HOLMES
v.
REMSEN.

(*Doug.* 170.) The true question is, whether it be not wise, and politic, and just, (where no positive law intervenes, and where it is not repugnant to the essential policy and institutions of the country,) to adopt the rule of international law which other nations apply to us, and which impairs no right, but promotes general justice, and is founded on the mutual respect, comity and convenience of commercial na-

*Huber's* statement of the doctrine.

tions. *Huber* has placed this subject on proper grounds, when speaking of the effect of the law of the foreign domicil, operating upon property within another jurisdiction : *Non vi legis. alienæ immediata, sed accedente consensu potestatis summæ in altera civitate, quæ legibus alienis in loco suo exercitis præbet effectum ; sine suo suorumque præjudicio, mutuæ populorum utilitatis respectu, quod est fundamentum omnis hujus doctrinæ. (Lib.* 1. tit. 3. *de conflictu legum,* s. 9.)

. Sir *William* Scott's opinion.

Marriage contracts, says Sir *Wm. Scott,* in *Gordon* v. *Dalrymple,* must, in an *English* Court, be adjudicated according to the principles of *English* law ; and what are the principles of *English* law applicable to such a case ? They are, that marriage rights must be tried by a reference to the law of the country where they had their origin. "Having furnished this principle, the law of *England* withdraws altogether, and leaves the legal question to the exclusive judgment of the foreign law."

Lord *Hardwicke's* opinion.

The decisions of Lord *Hardwicke* have applied the rule, that *mobilia non habent situm,* and that they are to be distributed according to the law of the owner's domicil, not only to the case of intestates' estates, but to the case of bankrupts' effects. In *Pipon* v. *Pipon,* (*Amb.* 25.) and in *Thorne* v. *Watkins,* (2 *Ves.* 35.) the rule was applied to the distribution of intestates' estates. Lord *H.* observed, that taking a oreign probate or letters of administration in the country where the property was situated, was but " for form," and to enable the party to sue ; and that all debts followed the person, not of the debtor, but of the creditor to whom due ; and that it would be most mischievous, if they

were to follow the person of the debtor. He said, the same doctrine had been applied, in the House of Lords, in *Morrison's* case, which was a case of lunacy, and the rule would be the same on a question between a Court of *France* and a Court of *England*. The case of Captain *Wilson*, an *English* bankrupt, which is cited by Lord *Mansfield*, in *Le Chevalier* v. *Lynch*, but cited and more fully explained by Lord *Loughborough*, in giving his opinion in *Sill* v. *Worswick*, (1 *H. Bl.* 691.) is the one in which the *lex domicilii* was applied by Lord *Hardwicke*, to the distribution of a bankrupt's estate. He said, that the Court of Session in *Scotland*, entirely concurred with Lord *Hardwicke* in that case. There were three sets of *Scotch* creditors who put forward their claims in opposition to the title of the *English* assignees.— Some of the creditors of *Wilson* had an assignment of specific debts, with intimation or notice to the debtor, so as to create, under the *Scotch* law, a specific lien, *quoad* that debt. Other creditors had assignments, without any such intimation prior to the bankruptcy, and which, by the *Scotch* law, gave the assignee a right inferior to that of the creditor who had obtained his assignment and intimated it. A third class of creditors had arrested or attached the debts, subsequent to the bankruptcy. Lord *H.* and the Court of Session agreed, that the first class of creditors were to be considered as claiming by mortgage, before bankruptcy, and if they came in under the *English* commission, they must come in on the footing of other creditors, and were first to account for what they had received; and they further agreed, that the title of the second class by assignment, was preferable to the title by arrestment; and that the *arrestments*, (which is a *Scotch* process for the recovery of debts,) *being subsequent to bankruptcy, were of no avail, the property being, by assignment, vested in the assignees under the commission.*

I should presume we might rely upon the entire accuracy of Lord *Loughborough's* report of the case of *Wilson*. The state of this case, which is loosely given in *Cleve* v. *Mills*,

(*Cooke's B. Law*, 243.) decided by Lord *Mansfield*, at the Cockpit, in 1764, is manifestly incorrect; and it further shows, that the short note of the case of *Cleve* v. *Mills*, is not sufficiently authentic to be regarded. This case of *Wilson* is also cited by counsel in *Selkrig* v. *Davis*, under the title of *Assignees of Wilson* v. *Fairholme*, as being decided in 1755, and the account of it coincides with Lord *Loughborough's* report. The case of *Morrison*, mentioned by Lord *Hardwicke*, is more fully stated by Serjeant *Hill*, in his very elaborate argument in the case of *Sill* v. *Worswick*. From these cases, we have full evidence that in the time of Lord *Hardwicke*, it was understood and settled, as the rule of international law, that the effects of intestates, of lunatics, and of bankrupts, were to be distributed, not according to the *lex rei sitæ*, but according to the law of the owner's domicil. It was also settled, that in the latter case, an attachment by a *Scotch* creditor, under the *Scotch* law, subsequent to bankruptcy, would not avail against the right of the *English* assignees; and that in the second case, the committee appointed under a commission of lunacy, had a right to sue for and recover his property in *Scotland*, equally as if they held under his voluntary assignment..

If we follow the cases down from that period, we shall find the same principle equally recognized, but with the advantage of being more matured, more fully developed, and better understood.

<span style="float:left">Opinion of Mr.<br>Justice *Bathurst.*</span> In *Solomons* v. *Ross*, (1 *H. Bl.* 131. *note*,) which, in 1764, came before Mr. *Justice Bathurst*, sitting for Lord *Northington*, the parties were merchants in *London*, and Messrs. *Deneufvilles*, of *Amsterdam*, corresponded with them. In 1759, Messrs. *D.* stopped payment, and in 1760, the chamber of desolate estates, in *Amsterdam*, took cognizance thereof, and they were declared bankrupts, and curators or assignees of their effects appointed. *Ross* was a creditor of theirs, and two days after they had stopped payment, and a few days before the curators were appointed, he attached, in

the Mayor's Court, in *London*, their money in the hands of their debtor, *M. Solomons*. In 1760, *Ross* obtained judgment by default, and execution issued against *S.* the garnishee, who gave *Ross* his note for the debt. After this, *I. Solomons*, as attorney for the curators, filed a bill in chancery on their behalf, praying that the garnishee might account as debtor to them, and be restrained from paying *Ross*. *S.*, the garnishee, filed a bill of interpleader, and brought the money into Court; and it was decreed, that the money be paid to *I. Solomons*, the complainant, for the creditors of the bankrupts, and that *Ross* deliver up the note, to be cancelled.

This is a strong and interesting decision, applying, in favour of other nations, the rule which *England* asks for herself. There can be no doubt of the general authenticity and accuracy of the report. Lord *Loughborough* said, he was counsel in the cause, and that it was decided solely upon the principle that the assignment of the bankrupt's effects to the curators of desolate estates, was an assignment for a valuable consideration, and therefore acknowledged in *England*, agreeable to Captain *Wilson's* case in the House of Lords. The principle of the case is valuable and imposing; but I think the application was pushed too far, if the dates are given correctly; for the attaching creditor had commenced his suit, and so gained a priority in time, before the curators were appointed in *Holland*. Perhaps, however, the Court may have considered the title of the curators, as relating to the time when the bankrupt stopped payment, and on that ground, the decree was correct; though it would seem, from proof taken some years afterwards, in the case next to be cited, that a bankrupt's effects in *Holland* vested only from the appointment of the curators. An error on this matter of fact, does not in the least impair the value and authority of the case, as to the principle it contains.

Again, in *Jollet* v. *Deponthieu* and *Baril*, which arose be-

fore Lord Ch. *Camden*, in 1769, (1 *H. Bl.* 132. *note*,) the *Deneufvilles*, (but not those in the former case,) merchants at *Amsterdam*, stopped payment on the 30th of *July*, 1763. On the 8th of *October* following, the plaintiffs were appointed curators of their effects, and the bankrupts owed the defendant *D.*, of *London*. On the 5th of *Jan.* 1764, the defendant *D.*, attached the money of the bankrupts, in the hands of *B.*, one of the defendants, and a debtor of the bankrupt. Pending the attachment, the curators filed their bill for an account between the bankrupt *B.*, and that the balance might be paid to them, and the defendant, *B.*, restrained from proceeding on the attachment. The decree was, that the plaintiffs recover the balance due, and that a perpetual injunction issue against proceeding on the foreign attachment.

Lord *Kenyon*, in *Hunter* v. *Potts*, (4 *Term Rep.* 182.) speaks of this and the preceding decision as correct; and he says, that Lord *Camden* thought this last a very clear case; and it establishes this great doctrine, that the title of the foreign assignee of a bankrupt's estate, under the law of the bankrupt's domicil, was to be preferred to the subsequent attachment of the domestic creditor, made here under our own attachment law.

The case of *Neale* v. *Cottingham* and *Houghton*, (1 *H. Bl.* 132. *note*,) arose in *Ireland* before Lord Ch. *Lifford;* and Lord *Kenyon*, in reference to this very decision, speaks of that Chancellor, as a very respectable authority. *G.*, a merchant in *London*, was indebted to the defendant *C.*, a merchant in *Dublin*, and the defendant *H.* was indebted to *G.*, and on the 27th of *October*, 1763, *C.* attached the debt due from *H.* to *G.*, for his debt. On this attachment, judgment was rendered, in 1764, and *H.*, the garnishee, was taken in execution, and then paid the debt. On the 28th of *October*, 1763, a commission of bankruptcy issued in *England*, against *G.*, and he was on that day declared a bank-

*Decision by the Chancellor and Judges of Ireland.*

rupt.  On the 10th of *Nov.* 1763, his effects were assigned to the plaintiffs, who, in *Nov.* 1764, filed their bill in the Court of Chancery in *Ireland*, against *C.* and *H.*, praying for an account of the monies received by *C.* from *H.*, for the debt due *G.* before his bankruptcy, and that *C.* might be decreed to pay it.  The Lord Chancellor, (as the case was new,) called in the assistance of the judges, and after great consultation, he, with their approbation, decreed in favour of the plaintiffs, and ordered *C.* to pay the money he recovered of *H.*

This case went farther than, I apprehend, the doctrine on the subject requires, for it gave effect to the title of the assignees, by relation back, beyond the time of their appointment, to the time of the act of bankruptcy committed, and so overreached the time of the attachment.  This doctrine of relation, is a positive rule of mere municipal policy, which no other country is bound to adopt, as it would lead to great inconvenience; and it is sufficient upon the rule of the international law, as now declared and understood, to give effect to the title of the assignees, from the time the assignment to them was actually made, as being a substitute for the voluntary assignment of the bankrupt himself; and, perhaps, we may say that no concession is to be made to foreign interests, which would materially disturb the whole order and policy of our internal arrangements.  The rule is, that *comitas* is to be observed, *quatenus sine præjudicio indulgentium fieri potest.*

The recognition of the title of foreign assignees had now become so well settled, and was so generally received, as a rule of public law, that when Lord *Thurlow* was told, (in *Nov.* 1787.) in the case *ex parte Blakes*, (1 *Cox*, 398.) that in *America*, the interest of the assignees, under the *English* bankrupt laws, was not noticed, he observed, with surprise, that " he had no idea of any country refusing to take notice of the rights of the assignees, under their laws, and he believed every country on earth would do it, besides."

1820.

HOLMES
v.
REMSEN.

But the title of the foreign assignees, takes effect only from the date of the assignment to them, and has no *relation* to the time of the act of bankruptcy committed.

For the doctrine of *relation*, in regard to bankrupts, is a positive rule of mere municipal policy; and the rule of *comity* between nations does not require its adoption.

Lord *Thurlow's* observation, in 1787.

In *Hunter* v. *Potts*, (4 *Term Rep.* 182.) it was decided, that if, after assignment of a bankrupt's estate, a creditor, knowing of it, and residing in *England*, attaches the money of the bankrupt abroad, the assignees may compel him to refund it.   As this case was decided between subjects of the same government, and equally owing obedience to the bankrupt laws, and on the ground that they must do no act to contravene them, it does not directly apply to the question before me.   But it is a case well worthy of attention, as it treated, largely and liberally, the general subject under discussion ; and I think it may be considered as the acknowledged law of that case, that the representative character of the assignees of a bankrupt, is recognized by the general law of nations, which adopts the *lex domicilii* as the rule, in respect to personal property.   It was held by the Court, that the personal property of the bankrupt, wherever situated, passed by the assignment in the same manner as if the owner had assigned it by his own voluntary act, unless there was a positive law of the foreign country, where the property was situated, directing a particular mode of conveyance; and Lord *Kenyon* took occasion to observe, that an assignment, under the bankrupt acts, might be taken to be an assignment for a valuable consideration.

The case of *Sill* v. *Worswick*, (1 *H. Black.* 665.) was decided shortly after in the *C. B.* upon the same ground ; that an *English* creditor, after an act of bankruptcy, cannot attach, in a foreign country, money due to the bankrupt, *Lord Lough-* without being liable to refund it to the assignees.   This *borough's ex-* case is distinguished for the precision, perspicuity, and force *position of the* *law on this sub-* with which Lord *Loughborough*, in behalf of the Court, *ject.* declared the general doctrines of international law,  on the subject of the operation of bankrupt laws, *extra territorium.* He observed, that it was a clear proposition, not only of the law of *England, but of every country in the world, where law had the semblance of science,* that personal property had no locality, and was subject to the law which governed the

person, both with respect to the disposition of it, and to the transmission of it, either by succession, or the act of the party—that there was no difference in the cases on this subject, if they were rightly understood, and rightly applied—that if the *English* bankrupt had personal property out of the jurisdiction of the law of *England,* and which by the law of *England,* was, upon the bankruptcy, vested in his assignees, *if the country where it lies proceeds according to the principles of well regulated justice,* there is no doubt but that it will give effect to the title of the assignees—that the determination of the Courts of *England* had been uniform to admit the title of the foreign assignees: he referred to the cases of *Solomons* v. *Ross,* and of *Jollet* v. *Duponthieu,* (which have been already cited,) as founded on general law, preferring the title of the assignees to the title of the arresting creditor, and declared that the principle he had stated, had a very universal observance among nations.

He held, that an assignment, under a commission of bankruptcy, was for a just consideration, and was to be preferred to the claim of all creditors, wheresoever, who had not acquired a specific *lien* prior to the act of bankruptcy committed, though he admitted that, if by the law of a foreign country, a foreign creditor had been preferred, it could not be helped; and such preference, however repugnant to principle, could not be disturbed.

The same question decided in the two preceding cases, came before all the judges, in the Exchequer Chamber, on error from the K. B. in *Philips* v. *Hunter.* (2 *H. Blacks.* 402.) All the judges who expressed any opinion, except one, concurred in the judgment of the K. B., and gave their sanction to the general doctrine contained in these cases. It was admitted, that, before bankruptcy, the bankrupt might assign his property abroad as absolutely as if it had been in his own tangible possession; and the assignees were entitled, by operation of law, to deal as he might have done with his property. The whole property of the bank-

*1820.*

HOLMES
v.
REMSEN.

Adopted by the common law judges, in *England.*

*1820.*

HOLMES
v.
REMSEN.

rupt must be under their control, without regard to its locality, except in cases which militated against the particular laws of the foreign country. If the bankrupt laws were circumscribed by the local situation of the property, a door would be opened to all the partiality and undue preference which they were framed to prevent, and property would be sent abroad, with unjust views, by the bankrupt, immediately previous to his failure. It was, therefore, on wise principles, that foreign States acknowledged and acted according to the different civil relations which subsist between men in their own country.

Lord *Ellenborough's* opinion, 5 *East,* 131.

But why need we go further with *English* cases on this subject? To recognize the laws of foreign countries as binding on personal property, in a variety of cases, has been so long settled in principle, that according to Lord *Ellenborough's* expression, (5 *East,* 131.) it is now *laid up* among our acknowledged rules of jurisprudence.

We have two recent decisions in the Court of Session in *Scotland,* (and one of them affirmed, in the House of Lords,) in which this great doctrine of national law has been profoundly discussed, and laid down and vindicated with distinguished learning and ability.

Opinions of the Judges of the Court of Session in *Scotland,* in 1813.

*Stein's* case (1 *Rose's Cases in Bankruptcy, App.* p. 462.) was decided in 1813, and it declared the law to be, that an *English* commission of bankruptcy vested in the assignees all the property of the bankrupt, wherever situated, precluding creditors in *Scotland* from subsequently attaching, by sequestration, their debtor's property in *Scotland,* and from administering it in a course of distribution under such process of sequestration. It further declared, that a sequestration in *Scotland,* would preclude *English* creditors from suing, or sustaining a commission against a debtor who was the subject of the prior sequestration; and that, whether the *English* commission, or the *Scotch* sequestration, was to be preferred, as to the mode of administering the debtor's effects, depended upon their priority.

Lord *Robertson*, in giving his opinion, observed, that it was a question of great importance, what was to be the effect in *Scotland*, of an *English* commission of bankrupt; that they had clear principles of international law to govern them, and to which they ought to adhere, unless they were to throw into confusion the whole system of bankrupt law. That the effect to be given to such a commission in every country where the true principles of international law were understood, was, that it must carry the whole effects belonging to the bankrupt, and that the subsequent *Scotch* sequestration could not be permitted to control the commission. That moveables followed the person of the owner, and their condition was governed by the law of his domicil, a fiction introduced upon the soundest principles of justice; and, in practice, attended with the most beneficial consequences. Lord *Meadowbank*, who, also, gave his reasons at large, concurred in the same doctrine, and declared, that after a commission, nothing remained of the personal estate, on which a sequestration could operate, any more than under a voluntary conveyance by the bankrupt. He admitted it was formerly a principle, that a judicial transfer only operated *intra territorium*, and had no binding influence abroad ; but the new rule had now been so long recognized, that *it might be considered a principle of the law of nations*. A marriage operated as a legal assignment of the property of the wife to the husband, without regard to territory, all the world over, and he perceived the predominant, the irresistible necessity, in point of expediency, of adopting the rule that Lord *Hardwicke* adopted in one of the cases, when a departure from it would be attended with inextricable confusion.

All the other Judges of the Court of Session were of the same opinion, and expressed themselves to the same effect. One of them (Lord *Bannatyne*) observed, that a prior *English* commission did not, *ipso jure*, prevent the award of a

CASES IN CHANCERY.

sequestration, though the effect of it would be an after ques-
tion, depending on circumstances which might, perhaps,
justly destroy the effect of the commission. But the Court
reserved themselves upon the point, whether, in case they
were satisfied, the party subjected to the commission was
domiciled in *S.*, and had not been duly domiciled in *E.*,
where the commission issued, they were bound to give ef-
fect to it. The *Lord Justice Clerk* held, that they were
bound to watch, lest any such proceedings should be carried
on by persons domiciled in *Scotland*, which might interfere
with the application of their own rules of law.

This decision of the highest Court of law and equity in
*Scotland*, upon a point of public law, comes with much au-
thority, after so full and elaborate an investigation of the
question. Nor are we permitted to presume that it proceed-
ed from a principle of mere deference to the *English* law,
or system of jurisprudence. We have several decrees of
that same Court, and by the same Judges, supporting *Scotch*
decrees of *English* marriages between *English* subjects,
(see *Ferguson's Reports of some recent decisions by the Consis-
torial Courts of Scotland, passim,*) in which the independent
spirit of their administration of the law, in opposition to *Eng-
lish* law and policy, and in opposition to what was deemed
by the Consistorial Court, international law, is sufficiently
demonstrated. They feel perfectly free, whenever they deem
it proper, to vindicate the supremacy of the law of *Scotland*
within its own territory.

The other case to which I alluded, is that of *Selkrig* v.
*Davis* and *Salt*, (2 *Dow.* 230. 2 *Rose*, 291. S. C.) decided
in the House of Lords in 1814, on appeal, and in affirm-
ance of the decree of the Court of Session. The case was
discussed very much at large upon the appeal, and a history
given of the *Scottish* decisions on the question, from the
year 1747 ; and I believe it is understood, that on such ap-
peals the municipal law of *Scotland* is carefully observed.

*The opinion of
the Court of
Session in
Scotland,
affirmed in the
House of
Lords,*

By the decree, it was declared to be the settled law in *Scotland*, founded on a principle of international law, that the assignment under an *English* commission of bankruptcy, vests in the assignees, without the necessity of intimation, the whole personal estate of the bankrupt in *Scotland*, or wherever situated, and that the effect of all subsequent diligence by any *Scotch*, or other creditor, was thereby precluded. In this case, a commission issued in *England* against a debtor, part of whose property consisted of shares of *Carron* stock, and a creditor in *Scotland* afterwards arrested those shares, and it was held by the Court of Session, and, on appeal, by the House of Lords, that the title of the assignees was preferable. It was, likewise, held, that the commission did not affect real property in *Scotland*, nor impose any legal (though Lord *Eldon* thought it did, also, a moral) obligation on the bankrupt to convey to his assignees ; but the creditors had it in their power to enforce a proper conveyance of the real estate, by giving, or withholding the bankrupt's certificate.

The counsel for the respondents observed, (and their doctrine may well be assumed to be the doctrine of the House of Lords, which affirmed the decree,) that it had been repeatedly decided, that a foreign commission passed the effects in *England* to the foreign commission, and the presumption was, that such was the law of all the world. That when it was said, that the property of the bankrupt abroad might be attached, notwithstanding the commission, it meant only, that the law of *England* could not be administered in foreign countries, and that the law of a particular state might form an exception to the general rule among civilized nations. That if two nations were at war, it might be doubted whether a commission in one country, could prevent the effect of an attachment in the other, where the attaching creditor could have no remedy under the commission, and that the only distinction was, whether the creditor

1820.

HOLMES
v.
REMSEN.

Lord Eldon's
Opinion.

could have his remedy. That this rule was not the result of domicil, but of the courtesy of international law.

Lord *Eldon*, in giving his reasons in the House of Lords, in favour of the decree, said, that *Stein's* case involved the general principle; and he agreed that the *Scotch* cases, prior to that of *Sroothers* v. *Reid*, in 1803, exhibited a very distressing versatility of opinion. But it was clear, that the *English* commission passed the personal property in *Scotland*, and in all other parts of the world; and there was no authority or *dictum* to the contrary. A general assignment by a bankrupt, of all his effects, for the benefit of all his creditors, operated like a transfer by marriage, in *England*, which rendered the *Scotch* property of the wife her husband's, without the necessity of notice; and the *Scotch* law, as to intimation or notice, did not, and could not apply, without cutting up by the roots the use of an *English* commission in relation to *Scotch* property.

We have now shown that the rule in question is firmly settled, and recognized as a rule of national law, by all the Courts in *England*; by the Court of Chancery in *Ireland*, and by the Court of Session in *Scotland*. The opinion of so many tribunals, of such high character and great learning, is certainly to be considered as very strong evidence of the existence of the rule, to the extent, and with the pretensions under which it has been announced.

I entertain no doubt that the same rule is known and observed among the other nations of *Europe*. It is embraced by the general principle, so universally recognized by the civilians, that the distribution and disposition of personal property, are governed by the law of the owner's *domicil*.

Law of *France*
on this subject.

But in the appendix to *Cooper's Bankrupt Law*, p. 27. we have a report of the case of *Parish* v. *Sevon*, decided in the *French* Court, at *Dunkirk*, in 1780, which is perfectly in accordance with the preceding cases. The defendant, a merchant at *Paris*, and a creditor of *C. & C.*, *English* bankrupts, had attached, at *Dunkirk*, a debt in the hands of *De*

*Gravier*, due to the bankrupts before their failure. The attachment was laid subsequently to the issuing of the *English* commission; and the question arose in the city Court at *Dunkirk*, between the *English* assignees of the bankrupts, and the *French* attaching creditor, which had the better title to the money in the hands of *De Gravier*, the garnishee. The cause was heard, and received mature deliberation; it was declared that the assignees were entitled to the money, and that the attachment be dissolved, and the *French* creditor was even condemned to pay the costs. The opinions of two advocates of the Parliament of *Paris*, had been previously taken by the *English* assignees, which opinions are subjoined to the case; and they agreed that the *French* creditor was not entitled, in consequence of his attachment, to any privilege or preference over the general creditors, but must take his rateable dividend under the *English* commission. In one of these opinions, dated at *Paris*, 4th December, 1778, and given by *M. Babille*, it was observed, that the laws of commerce were a branch of the law of nations, and that the property of an insolvent debtor, wherever it may be found, was the common pledge of all his creditors, whether natives or aliens; and that personal property followed the person of the owner, and was governed by the laws of the place where he resided. Commercial contracts were to be governed by the universal law of nations; *non erit lex alia Romæ, alia Athænis.*

It is admitted in every case, that foreign assignees, duly appointed under foreign ordinances, are entitled, as such, to sue for debts due to the bankrupt's estate. So far, says Lord *Kenyon*, in *Smith* v. *Buchanan*, (1 *East*, 6.) we give effect to foreign laws of bankruptcy, on the ground, that personal property must be governed by the laws of the country where the owner was domiciled. This is a recognition of their title, and an admission of the substitution, as made by the *lex loci*; and it seems difficult to make a dis-

*1820.*

*HOLMES*
*v.*
*REMSEN.*

tinction between its validity for this purpose, and not for every other reasonable purpose of securing the bankrupt's effects. But there is an inconsistency, as it has been alleged, in the practice on this subject, which gives effect to the assignment, and will not give effect to the bankrupt's certificate of discharge. Lord *Talbot*, as long as a century ago, (*Cooke's B. Laws*, 347—*Beawés' Lex Mer.* 6th ed. 516.) complained of this inconsistency; and while he admitted that the assignment carried with it the bankrupt's effects abroad, he thought it would be reasonable that the certificate should be co-extensive in its operation with the assignment. The

Opinion as to the extent of the operation of the certificate of the bankrupt's discharge.

Court of Session, in *Stein's* case, went the whole length of declaring that a certificate obtained under an *English* commission, operated as a discharge of the debts of the *Scotch* creditors, proveable under the commission. Admitting that there is a want of harmony between the parts of the system of rules on this subject, it will not affect the binding force of the rules, taken separately, that the assignment does carry all the personal property of the bankrupt, wherever situated; and that the certificate is no bar to a foreign creditor, who does not come in under the commission. Suppose the debtor, independent of the statutes of bankruptcy, or in a case were they did not apply, or in a place where they did not exist, had made a general assignment of all his effects to trustees, for the benefit of all his creditors, it would, no doubt, have been a good and valid assignment, and have carried all his effects; but it would not have been a bar to the suits of those creditors who did not come in and take their share of the property upon his terms. The assignment, however, would have carried, in equity, all his foreign debts, and prevented a subsequent attachment of them. In *Lewis* v. *Wallis*, (*Sir T. Jones*, 223.) the K. B. held, that after the assignment by *A.* to *B.*, of a debt due to *A.* from *C.*, it became the right of property of *B.*, and *A.* had no

interest in it, but as a trustee for *B.*, and the debt was no longer liable to a foreign attachment, as the debt of *A.* It is a very clear proposition, that a voluntary assignment, made *bona fide*, by a debtor for the payment of his debts, is valid, and founded on a valuable consideration, and will operate upon his foreign debts, and preclude a subsequent attachment of them. These rules, which may be apparently conflicting, rest on very different principles, and which are sufficient to sanction each of them, in their diversity. We are bound to give effect to the assignment, because it is equivalent to a voluntary act of the party over his own property, or because the property is supposed, by a fiction of law, to be attached to his person, and to be within his domicil, or because we are bound to do so by the comity of nations. Bankruptcy, said Lord *Mansfield*, in *Wadham* v. *Marlow*, (1 *H. Blacks.* 437. *note.* 8 *East*, 314.) is an act done by the bankrupt himself, and he is liable, on his covenant, for rent, equally, as if the assignment was voluntary, in contradistinction to its being required by law. Every man's assent is to be presumed to a statute. The same principle was advanced by Ch. J. *Parsons*, in *Goodwin* v. *Jones*, (3 *Tyng*, 517.) when he considered the assignment under the bankrupt laws, as the party's own act, since it was in execution of laws by which he was bound, and since he voluntarily committed the act which authorized the making of it. *Voet (Com. ad Pand.* 38. 17. 34.) states either of two grounds as sufficient for the rule of distribution of the intestate's effects, according to the law of his domicil ; *vel quia semper domino præsentia esse finguntur, vel de comitate, passim usu inter gentes recepta.* It is immaterial, for the present purpose, on which principle we give effect to the title of the foreign assignee. Either is a stable and sufficient ground, and has no application to the other question, whether the foreign certificate should cancel the debt of a creditor who is not a subject of the foreign government, and has given no assent to the proceeding.

1820.

HOLMES
v.
REMSEN.

A *voluntary* assignment made *bona fide* by a debtor, of all his property, for the benefit of all his creditors, is valid, and will pass debts due to him in foreign countries.

So will an assignment under the *bankrupt* law of his country; either because it is equivalent to a voluntary assignment by the debtor; or because the *domicil* of the owner draws to his personal property; or because it is an established rule of *comity* among nations.

Every man is presumed to be assenting to, and a party to, the laws of his own country.

1820.

HOLMES
v.
REMSEN.

The attachment act under which the plaintiffs derive their character as trustees of the *English* bankrupt, reaches to all the estate, real and personal, of the bankrupt; and creditors residing out of the state are specially declared to be creditors within the act. The provisions of it are very comprehensive; and I entertain no doubt, that if the attachment and appointment of trustees under this act, had been first in time, and the proceedings had been consummated, without any interruption or *supersedeas* on the part of the debtor, the title of the trustees would have been recognized in all the *English* Courts, as controling the personal property there. In that case, the place of distribution of the funds would have been here, and not in *London*.

*Observations on the case of Milne v. Moreton, decided by the Supreme Court of Pennsylvania.*

During the examination of this question, I have not been inattentive to the case of *Milne* v. *Moreton,* (6 *Binney,* 353.) decided in the Supreme Court of *Pennsylvania,* in 1814, and which gave to their own attaching creditor a preference over the title of the *English* assignees, under a prior assignment. I have examined that case with great care, as well from respect to the character of the Court, as for the able discussion which it contains; and I can only be permitted to say, that from the view which I have taken, and the impressions which I have received of the law on the subject, it is not in my power to follow the conclusion of the majority of that Court. Considerable reliance seems to have been placed, in that case, upon the decision of the Supreme

*And on the case of Harrison v. Sterry, in the Supreme Court of the United States.*

Court of the *United States,* in *Harrison* v. *Sterry;* (5 *Cranch,* 289.) and I am not disposed to controvert the position, that in the distribution of bankrupts' effects in this country, the *United States* are entitled to a preference; because, this preference is given by a positive law, and the attaching creditors were likewise entitled to a preference, if their attachment was prior to the assignment under the *British* commission. But the latter part of the decree touching the distribution of

the surplus fund wants explanation; and we do not know the grounds of the decision. It is never, however, to be presumed, that any Court intends either to establish, or reject a litigated point of law, of great importance, merely by a dry decision, unaccompanied with argument or illustration.

The case before me has one strong and peculiar feature. There was not only the ordinary and regular assignment by law under the *British* bankrupt system, but there was also a concurrent and separate assignment by the bankrupt to the same assignees, upon the like trust, of all his personal property " not being, arising, or growing in *England* ;" and we have, therefore, the benefit of a voluntary assignment (as contradistinguished from that under the statute, and which operates *in invitum*) by the act of the bankrupt himself. This seems to have been done for greater caution, and to meet the difficulty that might arise as to the reception of the statute assignment, on this side of the *Atlantic.* This would seem to have removed every obstacle in the case. But I do not place much reliance on the distinction, and it does not appear to me to make any difference in the application of the principle, whether he made the transfer himself, or the law of his domicil for him. It is, in either case, in contemplation of law, his act. The act of bankruptcy was his act, and the law of his land, by which he was bound, operating upon that act, worked the transfer. There was, therefore, no longer any debt due to him in this state, upon which the subsequent title of the plaintiffs could attach.

I am, accordingly, of opinion, that whether we consider the recovery of the debt in question under the foreign attachment, or the prior assignment of it with the property of the bankrupt under the *English* commission, the plaintiffs have no equitable claim to it, and the bill must, consequently, be dismissed. As the parties are all before the Court in

1820.

HOLMES
v.
REMSEN.

A concurrent and separate assignment, made by the bankrupt to his assignees, upon the same trust as that made under the bankrupt law, of all property out of *England,* though it may strengthen the case of the foreign assignees here, makes no difference in the general doctrine. The effect is the same, whether the transfer is made by himself, or by the law of his domicil, for him.

a representative character, and have been litigating serious and important questions, without any imputation of misconduct, I shall dismiss the bill without costs.

Decree accordingly.