SAMUEL MAY & others *vs.* RICHARD F. BREED & another.
SHEPHERD H. NORRIS *vs.* SAME.

A discharge, under the English bankrupt law, of a merchant residing in England, from a debt to a citizen of Massachusetts, contracted and payable in England, is a bar to a subsequent action on the debt in this state; whether the creditor proved his debt under the English commission of bankruptcy or not.

THE first named case was an action of assumpsit, brought against the defendants as acceptors of a bill of exchange, of which the following is a copy: " Boston, May 30, 1839. Exchange for £1,000 stg. Sixty days after sight of this first of exchange, (second and third not paid,) pay to the order of Messrs. Samuel May & Co., in London, one thousand pounds sterling, value received, and charge the same to account of

Eben Breed. To Messrs. R. F. Breed & Eccleston, Liverpool." The defendants accepted the bill at Liverpool, by writing the following words on its face: " No. 1594. June twenty-fifth, at Messrs. Prescott, Grote, Ames, & Co. R. F. Breed & Eccleston." Prescott, Grote, Ames, & Co. were bankers in London. When the bill became payable, it was duly presented for payment, which being refused, it was then duly protested for non-payment.

At the time when the bill was drawn, and when it was accepted, the defendants were partners, resident in and carrying on business at Liverpool, in England, under the firm of R. F. Breed & Eccleston. R. F. Breed was born in Massachusetts, in 1781, and resided there till 1804, when he went to England, where he has ever since resided, and carried on business as a merchant. The other defendant, Eccleston, was and is a British subject. The bill was drawn in Boston, Massachusetts, and bought here by the plaintiffs of Eben Breed, the drawer. When the bill was drawn, the plaintiffs were citizens of Massachusetts, residing in Boston, and they have ever since continued so. Eben Breed, the drawer of the bill, was also a citizen of Massachusetts when the bill was drawn. The defendants have obtained a certificate of discharge, under the English bankrupt law, dated the 24th of February, 1841. The plaintiffs did not prove their claim against R. F. Breed & Eccleston's estate, and have received no dividend. Two dividends have been declared and paid to other creditors, who have proved their claims, and the settlement of the estate is not yet closed.

The case was submitted upon the foregoing statement of facts, with the agreement that the court might order a nonsuit or default, or make such other order as the case might require.

The case was argued at March term, 1849.

*S. E. Sewall,* for the plaintiffs.

It is admitted, that foreign laws have no authority, as laws, out of the jurisdiction which enacts them. To give effect in this state to the English bankrupt laws, is a mere matter of comity. And this court will refuse to give them any effect,

when it would be injurious to the rights of our citizens. 2 Huberus, lib. 1, tit. 3, *de confl. leg.* § 2; Story Confl. §§ 29, 32, 244; *Blanchard* v. *Russell,* 13 Mass. 1, 6; *Prentiss* v. *Savage,* 13 Mass. 20, 23; *Ingraham* v. *Geyer,* 13 Mass. 146.

A discharge, without the consent of the creditor, of the person and all subsequently acquired property of a debtor who does not pay his debts in full, is unjust, and ought never to be allowed any effect by the courts of a foreign country, except against citizens of the country where the discharge is obtained. A foreign creditor has not the means of detecting fraud, and has practically no opportunity of resisting a discharge.

A discharge in bankruptcy is a judgment of a court, between the creditors within the jurisdiction on the one side, and the bankrupt on the other, and cannot affect those creditors who were never within, and never submitted to, the jurisdiction. The principles of eternal justice forbid the passing of a judgment against any one without first hearing him. Story Confl. §§ 546, 547, 549, 586; *Bissell* v. *Briggs,* 9 Mass. 462, 468; *Hall* v. *Williams,* 6 Pick. 232, 239; *Woodward* v. *Tremere,* 6 Pick. 354; 3 Phil. Ev. (Cow. & Hill's notes,) 906, 907; *Ogden* v. *Saunders,* 12 Wheat. 213, 366; *Odwin* v. *Forbes,* 1 Buck, 57, 61. The only notice of proceedings required in England is publication in the London Gazette. 6 Geo. IV. *c.* 16, § 25, Eden, B. L. Appx. 36. Much less effect is given to foreign judgments by the French law than by ours; if a Frenchman fails in a suit abroad, he may sue again in France. Story Confl. § 616; Merlin Quest. de Droit, Jugement, § 14; 10 Touillier Droit Civil, (5th ed.) 121 to 127. By the civil law, the law of the place of the contract does not govern, unless the defendant or his property is found there to give jurisdiction. 3 Burge Col. and For. Law, 1018; J. Voet ad Pand lib. 5, tit. 1, §§ 73, 74; Johnston's Civil Law of Spain, 297, note. The English cases are collected in Eden B. L. (2d ed.) 420 to 424. And see *Pedder* v. *MacMaster,* 6 T. R. 609; *Armani* v. *Castrique,* 13 M. & W. 443, 447, where Pollock, C. B., says, "A foreign certificate is no answer to a demand in our courts; but an English certificate is surely a

2 *

discharge as against·all the world in the English courts."
There is no English case in which the court have held a fo·
reign discharge binding against an English citizen.

The decisions in this state establish the doctrine, that a
foreign discharge in bankruptcy cannot be set up here against
our citizens. *Proctor* v. *Moore,* 1 Mass. 198; *Baker* v.
*Wheaton,* 5 Mass. 509; *Watson* v. *Bourne,* 10 Mass. 337; all
of which were decided before any discussion arose on the con·
stitutional prohibition against impairing the obligation of
contracts. *Blanchard* v. *Russell,* 13 Mass. 1, is the only
Massachusetts case opposed to this view, and is overruled by
*Ogden* v. *Saunders,* 12 Wheat. 213. In *Braynard* v. *Marshall,*
8 Pick. 194, 197, Parker, C. J., recognizes the authority of
the earlier cases, which he had misrepresented in *Blanchard* v.
*Russell.* And see *Prentiss* v. *Savage,* 13 Mass. 20; *Tappan*
v. *Poor,* 15 Mass. 419, 422; *Blake* v. *Williams,* 6 Pick. 286,
306; *Agnew* v. *Platt,* 15 Pick. 417; *Betts* v. *Bagley,* 12 Pick.
572, 579; *Savoye* v. *Marsh,* 10 Met. 594; *Fiske* v. *Foster,* 10
Met. 597; *Springer* v. *Foster,* 2 Story, 383; *Shaw* v. *Robbins,*
12 Wheat. 369, note.

The case of *Ogden* v. *Saunders,* 12 Wheat. 213, is directly
to the same point. It was not decided on the ground that a
bankrupt or insolvent discharge impairs the obligation of a
contract; but on the ground that, on principles of international
law, such a discharge could have no extra-territorial opera-
tion. See opinions of Johnson, J., 12 Wheat. 274, 359. And
his opinion in that case is to be considered as the opinion of
the other judges, Marshall, Duval, and Story, who, concurring
with him, constituted the majority of the court. By Mar-
shall, C. J., and Story, J., in *Boyle* v. *Zacharie,* 6 Pet. 348,
643. See also *Woodhull* v. *Wagner,* Baldw. 296, 300.

But if the decision in *Ogden* v. *Saunders* was based on the
ground, that a discharge in bankruptcy, under a state law,
impairs the obligation of contracts, then the inviolability of
contracts, being a great constitutional principle, interwoven
in our national jurisprudence, as well as a principle of natural
justice, the court, in their discretion, ought to apply this
principle to the case of a foreign discharge.

And if the decision in *Ogden* v. *Saunders* was based on the ground last stated, then it proves that the bankrupt law of the country where a contract is made is no part of the contract, and that a discharge under such law is no more available here than one obtained in any other place.

There is another rule of law, leading directly to the same conclusion. It is now well established in the United States, in opposition to the English authorities, that an assignment under a foreign bankrupt law cannot be set up against American creditors here. *Ogden* v. *Saunders*, 12 Wheat. 360, 365; *Blake* v. *Williams*, 6 Pick. 286; *Milne* v. *Moreton*, 6 Binn. 353; *Harrison* v. *Sterry*, 5 Cranch, 289, 302; Story Confl. §§ 403, 409; 2 Kent, 406, et seq.; *The Watchman*, Ware, 232, 237. The reasons, on which these decisions are founded, apply with at least equal force to the case of a foreign discharge. There is a great show of equity in the claim of assignees to the bankrupt's property, for the general benefit of all his creditors; but there is no equity in the bankrupt's claiming his after-acquired property, without paying his debts out of it. The protection of our citizens is the object in each case; and it is as important to guard them against unfair discharges as against unfair bankruptcies. On the same principle, in cases of ancillary administration here, the court will not order assets here to be sent abroad, until creditors here are first paid. *Dawes* v. *Head*, 3 Pick. 128; *Richards* v. *Dutch*, 8 Mass. 506.

Story, in his Conflict of Laws, § 341, misrepresents the ground of the opinion of Johnson, J., in *Ogden* v. *Saunders*. And the authorities from the civil law, which he cites in §§ 331, 331 *a*, do not bear out his doctrine; they speak of cases of rescission, or of payment, or other performance of the contract, and not of the case of a discharge in bankruptcy. See 2 Boullenois des Statuts, etc. 447, 448, 456 to 459, 462, 472. Those American cases cited by Story, in § 335, which are unfavorable to the plaintiff, were decided before *Ogden* v. *Saunders*, and are therefore not entitled to much weight. The opinions of Story and Kent, on this point, are influenced by their strong bias in favor of foreign bankrupt laws, both as

to the effect of assignments and of discharges.  See 2 Kent, 393.

But there is another, and a special reason, why this court should deny effect to a discharge under the English bankrupt law, in the preference which it gives to certain classes of British creditors, and especially to the crown.   6 Geo. IV. *c.* 16, § 48;  Bac. Ab. Prerogative, (E.) 5;  Eden B. L. (2d ed.) 413;  1 Christ. B. L. 361, 531, 539, 540;  1 Cooke B. L. (8th ed.) 496.

*R. Choate*, also for the plaintiffs.

Every state is at liberty to give or withhold effect to a foreign law, without giving offence to any foreign government. The law of nations does not give effect to a foreign code. The question is to be decided by expediency, of which justice to our own citizens is the principal rule.   There is no public law of morality or kindness which will raise the presumption that we have adopted this provision of the English bankrupt law.   See Story Confl. §§ 23, 25, 26, 29, 31, 32, 34 to 38.

Is it judicially shown, that this state has consented to adopt the part of the English bankrupt law concerning discharges; or ought it now to adopt it, as against citizens of Massachusetts ?   The question is partly historical and partly judicial.

We cannot have adopted this law before 1789, for we were then a colony, and (1.) the English laws did not bind the colonies.  *Holmes* v. *Remsen,* 20 Johns. 229, 260;  *Blake* v. *Williams,* 6 Pick. 310, 312.   We were free to accept or reject them.   (2.) It cannot be presumed that we did it voluntarily, for England had not then promulgated the doctrine.   (3.) No other jurisprudence on earth had then adopted it.   The *cessio bonorum,* only, prevailed on the continent of Europe until long after.   (4.) From the state of our own insolvent law, the court will infer, that it was not then deemed, in a legal or moral sense, either just or politic to adopt it.   Down to 1838, we did not think it right to take away a debt without payment.   (5.) No nation is presumed to adopt a foreign bankrupt law without reciprocity.  Our *cessio bonorum,* or personal discharge, which was the only one recognized here, did not discharge a debt in England.

Not having adopted the principle while a colony, how does the case stand under the constitution of the United States? That constitution is a new and formal embodiment of national policy; and, by prohibiting the states from passing any law impairing the obligation of a contract, establishes the principle, that it is impolitic and unjust for one state to discharge contracts due to citizens of another. There is a greater degree of comity between different states of our Union than between foreign nations. By Taney, C. J. *Bank of Augusta* v. *Earle*, 13 Pet. 519, 590 to 593. This state cannot be presumed to give effect to a discharge obtained in a foreign country, when the constitution declares that a discharge in a sister state shall have no effect. No court will presume that we have adopted a law contrary to national policy or national ethics. Story, Confl. § 33; 1 Cooke B. L. (8th ed.) 488; *Odwin* v. *Forbes*, 1 Buck, 57, 60; 2 Huberus, lib. 1, tit. 3, § 2.

The bankrupt law of England is a legislative system. Comity is the adoption or rejection of an entire system. We ought not to take a part of a system without the whole. It is settled law, that we reject that part of the English bankrupt act, which distributes the bankrupt's effects; and that part being rejected, the other cannot be deemed to be adopted. 1 Bell Com. 9; *Burroughs* v. *Jamineau*, Mosely, 1. A foreign code should be adopted by legislation or treaty, not by adjudication.

*W. Dehon*, for the defendants.

The nature, construction, incidents, and legal effect of a contract are determined by the law of the place where the contract is made or to be performed. The question, whether a contract has been discharged by law — whether it has any subsisting legal obligation, capable of being enforced — comes within this principle, and does not relate to the remedy. *Burrows* v. *Jemino*, 2 Stra. 733; Anon. 1 Bro. C. C. 376; *Robinson* v. *Bland*, 1 W. Bl. 256, 259; *Talleyrand* v. *Boulanger*, 3 Ves. Jr. 447, 449; *Melan* v. *Fitzjames*, 1 B. & P. 138; *Odwin* v. *Forbes*, 1 Buck, 57, 63; 1 Chit. Com. & Man. 654; 2 Bell Com. 692; 3 Burge, Col. & For. Laws, 874 to 876; 2 Kent, 459; Story, Confl. § 331; *Pitkin* v. *Thompson*, 13 Pick.

64, 68; *Warder* v. *Arell,* 2 Wash. Va. 282, 295, 298; *Powers* v. *Lynch,* 3 Mass. 77; *Thompson* v. *Ketcham,* 8 Johns. 189; *Bartsch* v. *Atwater,* 1 Conn. 409; *Hull* v. *Blake,* 13 Mass. 153; *Houghton* v. *Page,* 2 N. H. 42; *Ory* v. *Winter,* 16 Martin, 277; *Harrison* v. *Edwards,* 12 Verm. 648, 652; *Williams* v. *Wade,* 1 Met. 82; *Warren* v. *Copelin,* 4 Met. 594; *Hayden* v. *Davis,* 3 McLean, 276; *Worcester Bank* v. *Wells,* 8 Met. 107. Various reasons are given in the authorities for this rule; some stating that the law enters into and forms one of the elements of the contract; others, that the law does not enter into the contract, but follows and acts upon it, wherever it goes; others, that there is an implied contract, to be governed by the local law; and others, that the sovereign law operates on all contracts made within its sovereignty, and is to be recognized by the comity of states. But, whatever be the reason, the rule is well established. Whenever a contract is sought to be enforced in a foreign forum, the law of its origin comes with it; and the court examine, first, whether any right or obligation was ever created by the law of its origin; and, secondly, whether that right or obligation still subsists, or has been discharged; and if it never had any legal existence, or has been legally discharged, the court will not enforce it, because that would be to create a contract between the parties, not to enforce one already existing.

There is nothing in principle to distinguish a discharge in bankruptcy from other discharges, by confiscation, tender, want of funds, wrong demand, payment under trustee process, or other causes, such as have been held good discharges in the authorities above cited; except that some of these depend on far less equitable considerations.

The validity of a foreign discharge in bankruptcy is fully recognized in England, and in this country. *Ballantine* v. *Golding,* 1 Cooke, B. L. (8th ed.) 487; *Potter* v. *Brown,* 5 East, 124; *Odwin* v. *Forbes,* 1 Buck, 57; *Edwards* v. *Ronald,* 1 Knapp, 259; *Quelin* v. *Moisson,* 1 Knapp, 266, note; 3 Burge, Col. and For. Laws, 876, 925; 2 Kent, 393; Story Confl. § 335; *Green* v. *Sarmiento,* Pet. C. C. 74; *Van Reimsdyk* v. *Kane,* 1 Gallis 371; *Hicks* v. *Brown,* 12 Johns. 142; *Le Roy* v.

*Crowninshield*, 2 Mason, 151, 161, 172, 175; *Sherrill* v. *Hopkins*, 1 Cowen, 103; *Ogden* v. *Saunders*, 12 Wheat. 213; opinions of Washington, J. 254, 259, 264; Thompson, J. 297, 300, 302; Trimble, J. 317, 320 to 324; Marshall, C. J. 333, 343, 347; Johnson, J. 281, 285. See also the following cases, decided since *Ogden* v. *Saunders : Parkinson* v. *Scoville*, 19 Wend. 150; *Bronson* v. *Kinzie*, 1 How. 311, 319, 321; *Mc Cracken* v. *Hayward*, 2 How. 608, 612; *Towne* v. *Smith*, 1 Wood. & M. 115, 132; *Lizardi* v. *Cohen*, 3 Gill, 430, 438; *Cook* v. *Moffat*, 5 How. 295. The principle for which we contend has been admitted by all the judges in these cases, except Johnson, J., and his first opinion, in *Ogden* v. *Saunders*, is at variance with his last. It has been recognized repeatedly by our courts. *Blanchard* v. *Russell*, 13 Mass. 1, 6, which cannot be considered as overruled on this point by *Ogden* v. *Saunders*, (see *Hall* v. *Williams*, 6 Pick. 232, 243) ; *Bradfora* v. *Farrand*, *Walsh* v. *Farrand*, and *Prentiss* v. *Savage*, 13 Mass. 18, 19, 20; *Coolidge* v. *Poor*, 15 Mass. 427; *Cockayne* v. *Sumner*, 22 Pick. 117.

Like the English bankrupt law, our insolvent law discharges the debtor from all debts, founded on any contract made by him after the act took effect, if made or to be performed within the commonwealth, *St.* 1838, *c.* 163, § 7; the preferences under our law are similar, § 12; and its general policy the same.

In deciding this question, this court represents a sovereign state, and no constitutional provision restrains its powers. Bankrupt laws are now universally deemed humane and just. The English courts would recognize our law, discharging a debt under similar circumstances. *Potter* v. *Brown*, 5 East, 124. The comity of states, and the commercial interests of the citizens of both countries require the recognition of this important principle ; and its adoption will tend to secure an impartial division of bankrupt estates among creditors of both countries.

*C. G. Loring*, also for the defendant.

It may be true, that to discharge a debt without the consent of the creditor is unjust; but a discharge under the bank-

rupt law of the country, where the contract is made and to be performed, cannot be said to be without the consent of the creditor. A bankrupt, as a member of a commercial community, has the right to a discharge from his debts on a *bonâ fide* surrender of his estates; and this right is recognized by the jurisprudence of all commercial countries. The law of the place of performance, common and statute, constitutes a part of the contract, whether made with a party within or without its jurisdiction. Marshall, C. J., in *Ogden* v. *Saunders*, 12 Wheat. 338, intimates that insolvent laws are remedial, and that therefore the legislature may alter them. This may be so; but still they are contemplated by the parties as elements of the contract, until changed by competent legal authority, and, therefore, if existing at the time of the fulfilment of the contract, they are to govern its obligation or discharge.

The answer to the argument upon the hardship that the discharge should affect a foreign creditor, who has no opportunity to contest it or prove it fraudulent, is, that by entering into such a contract, he submitted himself to these disadvantages. Besides; it would be much harder on the honest debtor, who has surrendered all his property under the laws which he contemplated at the time of making the contract, to enforce against him a contract which, by those laws, has ceased to exist.

The discharge is not a judgment, but one of the modes of determining or dissolving the contract, which the parties must have contemplated. But if it is a judicial proceeding, the bankruptcy court have jurisdiction by virtue of the previous consent given by the parties, by entering into the contract. The primary object of bankrupt laws is not to relieve the debtor, but to benefit his creditors, by securing an equal distribution of his effects among them all, foreign as well as domestic, and his discharge is only a consequence of the application of this remedy. After the discharge, the debt is at an end; 12 Wheat. 343; but until the discharge, the proceedings in insolvency are merely remedial, and do not prevent the creditor from prosecuting his claim in his own country, or elsewhere; and a foreign court, which had once acquired jurisdiction by the commencement of a suit, would not be divested

of it by a discharge obtained while the suit was pending. The cases of foreign assignments and of ancillary administration are merely a recognition of this principle.

There is no evidence of the law of this commonwealth prior to 1789, and it is immaterial what it was; for if our ancestors were not enlightened enough to adopt the principles of comity, that is no reason why we should not.

The doctrines of reciprocity and of the comity of nations are not founded upon the idea of the similarity of their laws upon the same subject, but upon the great principle of justice towards those who make contracts in foreign countries, to secure to them everywhere the benefit of laws with reference to which those contracts were made. The only question is, whether the foreign nation recognizes the operation of our laws on contracts made and to be performed here.

The decision in *Ogden* v. *Saunders* has produced much confusion, inequality, and injustice, by preventing the states from extending to each other the rules of comity and equity recognized among all civilized nations. So great were the evils resulting from that decision, that an act of congress was necessary to obviate some of them. Act of 1848, *c.* 18, (9 U S. Stat. at Large, 213.) Marshall and Story, who acquiesced in that decision, both distinctly repudiate the grounds taken by Johnson; and their subsequent declarations, in *Boyle* v. *Zacharie*, 6 Pet. 348, 643, that his opinion is to be taken as the opinion of the majority of the court, cannot be construed to intend all his dicta.

The provision of the constitution of the United States has reference to the mutual intercourse of the people of the states, and not to their relations with foreign countries. And the fact, that we are precluded from the benefits of the comity of nations at home, is no reason for cutting ourselves off from it as to all the rest of the world, and especially as to that nation, with whom we have more commerce than with all others, which has a system precisely similar to our own, and the courts of which have made the first advances towards us in this matter.

The soundness of the decision in *Ogden* v. *Saunders* has

been doubted by nearly every court that has had occasion to refer to it, including almost every judge now on the supreme court of the United States. See *Cook* v. *Moffat*, 5 How. 295; opinions of Grier, J. 307; Taney, C. J. 310; Daniel, J. 313; Woodbury, J. 315. The Massachusetts decisions must govern this court. The decisions of the supreme court of the United States cannot settle the rule of comity between the different states, much less between any state and a foreign nation. *Cook* v. *Moffat*, 5 How. 295, 311. The cases in this state, decided since *Ogden* v. *Saunders*, admit that that case overruled *Blanchard* v. *Russell*, so far as regards the validity in one state of a discharge obtained in another, but no further; and *Blake* v. *Williams*, 6 Pick. 286, 306, so far from overruling the general doctrine of *Blanchard* v. *Russell*, by implication, expressly declares the distinction in principle between laws regulating assignments, and those regulating discharges; and this distinction is recognized in all the authorities. Story Confl. §§ 331, 337 ; 2 Kent, 459; *Harrison* v. *Sterry*, 5 Cranch, 289; *Ogden* v. *Saunders*, 12 Wheat. 213, 343. As to the effect in one state or country of a discharge obtained in another, independently of the constitutional prohibition, see, in addition to the cases already cited for the defendant, *Johnson* v. *Hunt*, 23 Wend. 87 ; *Boggs* v. *Teackle*, 5 Binn. 332; *Farmers' & Mechanics' Bank* v. *Smith*, 6 Wheat. 131; *Sturges* v. *Crowninshield*, 4 Wheat. 122, 192; *McMillan* v. *McNeill*, 4 Wheat. 209. J. Voet ad Pand. lib. 4, tit. 1, § 29, p. 240, and 2 Boullenois, 462, support the doctrines laid down in Story Confl. § 331.

*Choate*, in reply.

Story considers that Massachusetts has established a more limited doctrine than that contended for by the defendants. Story Confl. § 340. The cases in 1, 5, and 10 Mass. are strong evidence that, previous to 1809, we rejected the doctrine. In *Blanchard* v. *Russell*, 13 Mass. 1, 9, Parker, C. J., speaks of the principle as new, not as well settled. And in *Blake* v. *Williams*, 6 Pick. 306, he admits that *Blanchard* v. *Russell* is overruled on this point by *Ogden* v. *Saunders*. The only English cases, previous to 1789, are *Burrows* v. *Jemino*, 2 Stra. 733,

better reported in Moseley, 1, in which the nature of the acceptance formed a condition of the contract, and the holder of the bill had actually litigated the question in the courts of Leghorn ; *Robinson* v. *Bland,* 1 W. Bl. 257, 259, which was decided on the ground that the contract was a gaming contract, absolutely void by the laws of England, where it was to be executed; and *Ballantine* v. *Golding,* 1 Cooke, B. L. (8th ed.) 487, in which, as was remarked in *Pedder* v. *Mac-Master,* 8 T. R. 607, it did not appear but that both the parties resided in Ireland.  The case in 1 Bro. C. C. 376, was a case of payment, understood as such, at the time, by both parties.

SHAW, C. J.* This case comes before the court upon an agreed statement of facts.  It is assumpsit by the plaintiffs, as payees, against the defendants, as acceptors of a bill of exchange for £1,000 sterling, dated at Boston, May 30, 1839, requesting the drawees to pay that sum to the plaintiffs, or their order, in London, drawn by Ebenezer Breed, payable in sixty days.  This draft was addressed to the defendants, R. F. Breed & Eccleston, at Liverpool, and by them accepted, payable at a banking house designated, in London.  It was presented at maturity for payment; but payment being refused, it was protested for non-payment. The defendants were partners and resident merchants, carrying on business at Liverpool, when the bill was drawn and accepted.  R. F. Breed was a native of Massachusetts, born in 1781, and resided here till 1804; he then went to England, where he has ever since resided, and carried on business as a British subject, and he still lives there.  Eccleston, the other defendant, was a British subject, and, as we understand, a native.  The bill was sold by Ebenezer Breed, the drawer, to the plaintiffs in Boston.  The plaintiffs were resident merchants in Boston, when the bill was drawn, and have ever since continued so.  Ebenezer Breed, the drawer, was also a citizen of Massachusetts when the bill was drawn.  The defence relied upon is, that R. F. Breed & Eccleston, the defendants, acceptors of the bill, were declared bankrupt, and obtained their certificate of discharge under the English bank

* FLETCHER. J., did not sit in this case.

rupt law, the certificate having been granted February 24, 1841. The plaintiffs did not prove their debt, under the commis- sion of bankruptcy, against the estate of R. F. Breed & Ec- cleston, and have received no dividend thereon.  Two divi- dends have been declared, and paid to other creditors, who have proved their claims, and the settlement of the estate is not yet closed.

We have transcribed nearly the entire statement of facts agreed, it being short, and every fact mentioned being signifi- cant and material.  The question is, whether the plaintiffs, resident citizens of Massachusetts, shall be barred of their action in the courts of this commonwealth, by a discharge from their debts duly obtained by the defendants, under the bankrupt laws of Great Britain.

It is very clear, upon these facts, that the contract, for breach of which a remedy is sought in this action, was made in England, and to be performed in England.  The contract between these parties was the contract made by the accept- ance of the defendants, to pay the sum drawn for; the bill was presented to them for acceptance by the plaintiffs, or by some person acting as their agent; it was thereupon accepted; and so the contract made in England.  It was expressly made payable in London.  The case, therefore, upon the facts, is entirely clear of doubt, plain and simple; it is a contract made in England, and to be performed in England, by persons residing and carrying on business in England, with a foreigner, acting therein, by himself, or his agent, if England.

Shortly after the making, and before the performance on this contract, the debtors were placed under a commission of bankruptcy, an adversary proceeding, under and by virtue of the laws of England, against a defaulting trader, upon doing certain acts, indicative of present or impending insol- vency.  These laws provide, generally, that, upon a trader's doing certain acts, considered acts of bankruptcy a creditor may apply for and obtain a commission, under which the whole of the trader's property is sequestered and taken into the custody of law, to be administered by officers ap-

pointed for that purpose, the proceeds of which, with some slight exceptions, are appropriated to the payment of all the bankrupt's debts, if sufficient therefor, otherwise to pay them in equal proportions, as far as it is sufficient for that purpose. The same law further provides, that if the bankrupt will honestly and faithfully coöperate in the proceeding, if he will disclose all his property and effects, and aid the officers appointed for that purpose by information and by all means in his power, and do all the duties required of him in the premises, he shall be absolved and discharged of all his debts, and receive a certificate, as the authoritative evidence of his right to such discharge. Such were the proceedings instituted against these defendants, in their own country, under the laws of their own country; such was the discharge which they obtained; and they insist that this is a good discharge against a debt previously contracted in that country, due and owing at the time of these proceedings, and which might have been proved under such commission, and in respect to which a dividend might have been received by the creditors. They also insist, that this was a discharge of the debt created by that contract, that it no longer existed as a debt, and that this discharge is therefore a good defence to an action seeking to recover such debt, in whatever country, court or tribunal, such action may be brought.

In the present case, no question can arise as to the place or country to which we are to look for the law, which is the *lex loci contractus.* A difficulty often arises, and cases become exceedingly complicated, (in consequence of the transaction being more or less affected by the laws of various countries,) in determining which, and in what proportion each shall govern; as, for instance, where the contracting parties belonging to different countries, enter into a contract in a third, perhaps to be executed in a fourth, and where a remedy is sought in a fifth. In the present case, beyond question, the law of England is the law of the contract, whatever may be the effect of that law upon the rights and duties of these parties.

I. It seems to be now a well settled rule of law, generally adopted by the courts of all civilized nations, that the law of

3 *

the contract is to govern it, and determine the rights of parties
under it, in all matters touching the modes of execution and
authentication of the form or instrument of contract; and also
in relation to the use and meaning of the language in which it
is expressed, the construction and interpretation of it, and the
legal duties and obligations imposed by it, and the legal rights
and immunities acquired under it.

It has sometimes been made a question, whether the exist-
ing law of the country, where a contract is made, by tacit
consent of the parties enters into and makes part of the con-
tract, so as to derive its force and obligation from consent; or
whether it is the law which follows, accompanies, and regu-
lates the construction of the contract, as a law to which both
owe obedience.   Perhaps both these considerations have their
influence and effect, in applying the rule of the *lex loci con-
tractus*, and depend in some measure upon the terms of
the contract itself.   So far, it depends upon the use and
meaning of language, whether it be used in a popular,
legal, or technical sense, and the force and effect of the terms
used, and the parties may be presumed tacitly to assent to, and
be bound by, the law of the place.   Thus, if one give a pro-
mise to pay a hundred dollars in sixty days, if this be in the
form of a promissory note, by custom, operating in effect as a
law, it creates an obligation to pay in sixty three days.  But pro-
visions of law of another character, affecting not the words of
the contract, but the mode of making and obtaining satisfac-
tion, as they do not spring from the language of the contract,
and would not ordinarily be a subject of express provision by
contract, may be considered as governing the contract, not by
consent, but by force of law.   As, for instance, a mortgagor
stipulates that the mortgagee shall have the land mortgaged,
absolutely, if the debt is not paid at the time stipulated; but
the law of the contract, the only law which can govern it, comes
in and declares that the title shall not be absolute, but condi-
tional, although the debt is not paid at the time stipulated.
This, however, as to the mortgage affecting the realty, may
be considered as governed by the *lex loci rei sitæ;* but the
same rule would apply in some cases of personal stipulation,

As, where a man binds himself to another, in the sum of one hundred dollars, the obligation to be absolute if the obligor does not pay fifty dollars in one year, the law makes it a debt for the smaller sum only. In both of these cases, we suppose, there is no doubt but the law of the contract would govern it, and it would not be competent for the parties, by any stipulation of their contract, to vary the law in this respect. The rule, therefore, that the *lex loci contractus* shall govern, is derived partly from the presumed consent of the parties, and partly from that law, to which both are subject, and to which both for the time being owe obedience. The contract must be governed by some law, and, no other being referred to, it must be the law of the place.

A question has sometimes arisen, whether the obligation of a contract, made in one country, to be performed in another, arises from the force and effect of the municipal law, either of the place of making or that of performance; or from that universal law of moral obligation, acknowledged by all men above the condition of barbarism, and admitted and carried into effect by the comity of all civilized nations. This may be a difficult and delicate question, in expounding that clause in the constitution of the United States, which prohibits the respective states from passing any laws impairing the obligation of contracts. The construction of this clause may be affected by a consideration of all the provisions of the constitution, of the relative powers intended to be vested in the United States, or reserved to the several states, of the condition of the legislatures of the several states, when they existed as British provinces, and by many considerations not affecting the general question. But if the question were, generally, whether the obligation of a contract is derived exclusively from moral duty and natural obligation, independently of positive law, or from the positive law of the place where it is made, to the exclusion of the moral duty and natural obligation, the controversy would be inconclusive, and lead to no result. We think it would be more correct to say, that each of these considerations has some influence, and that both municipal law and moral obligation concur in constituting the legal obligation of

a contract. And this is true, as well in regard to contracts made and to be executed within the state or country where the remedy is sought, as to those which are to be executed, or where the remedy is sought, in a state or country where the contract is not made. Universal law and natural obligation, on the one hand, and municipal law on the other, are not antagonistic to. each other. On the contrary, municipal law assumes the existence of moral duty, arising from natural law, and regulates it, so that it may form a plain and practical rule, adapted to the exigencies of a civilized community.

Natural law and moral duty, acknowledged by all enlightened men, and by the dictates of conscience, must bind men to keep faith and perform all engagements. But this duty is not precise and exact enough to form a practical rule for the government of men in society, in the various exigencies daily occurring. For instance, the law of nature requires that a person competent, in point of age, to make a promise or contract, shall be bound by it. But it does not approach to the determination of the question, what shall be the age of majority. It may well decide that an infant of tender years cannot contract, and that a person of mature years shall be bound by his promise. But between these extremes there is a wide range, within which it requires the positive law of society to provide a precise limit. Shall it be at twenty one, eighteen, or twenty five, or at what age? By the law of England, a person is competent to contract for necessaries before twenty one, but not to make contracts generally until that age. Here the law of moral obligation combines with the positive law of the country to constitute the obligation of the contract, holding him bound if made after twenty one, and not before, unless for necessaries. This then must be recognized as the law of the contract.

So the law of moral obligation binds one to perform his promise to pay a certain sum of money, without designating time or place. Positive law must determine what constitutes the thing called money, whether it be a particular denomination of coin, or money of account, or what shall be deemed

its equivalent in other coin, all of which are in a high degree artificial and conventional. So it must determine the time and place at which payment shall be due, when and under what circumstances interest shall be paid, the rate of interest, when it shall commence, and the like.

Suppose the law of France fixes twenty three or twenty five as the age of majority and competency to contract, and an Englishman should be sued in France on a pecuniary contract made in England at twenty two, would it not, by the comity of nations, be enforced in France, although the contract derives its obligation partly from the law of natural obligation, and partly from the positive or municipal law of the place of contract? It seems to be agreed on all hands, that contracts made in contravention of a law of the country, such as contracts for the payment of gaming debts and usurious loans, are void; although perhaps a rate of interest allowable by the laws of some countries, but exceeding the rate allowed by the law of the country in which the contract is made, can hardly be said to be contrary to the dictates of moral obligation; and, therefore, if moral obligation, and not the law of the place of contract, were to govern, it ought to be carried into effect when a remedy is sought elsewhere than in the tribunals of the place of contract.

As to the rule upon this subject, considering it upon general principles, without reference to the constitution of the United States, or the restrictions upon the authority of the respective states to pass insolvent or bankrupt laws, but regarding it as a question of the application of foreign laws amongst sovereign states, we think the rule is well expressed by Chief Justice Parker in the case of *Blanchard* v. *Russell,* 13 Mass. 1, 4. For though this case has been at times considered as overruled, in regard to the operation of a discharge under an insolvent law of one of the United States, yet we think the general principles advanced have been repeatedly recognized as sound law. After suggesting that laws cannot by their intrinsic force operate extraterritorially, but that the courtesy, and comity, and convenience of nations, between whom commerce exists, has sanctioned the admission and

operation of foreign laws relative to contracts, he adds: " So that it is now a principle generally received, that contracts are to be construed and interpreted according to the laws of the state in which they are made, unless from their tenor it is perceived that they are entered into with a view to the laws of some other state. And nothing can be more just than this principle. For when a merchant of France, Holland, or England, enters into a contract in his own country, he must be presumed to be conusant of the laws of the place where he is, and to expect that his contract is to be judged of, and carried into effect according to those laws; and the merchant with whom he deals, if a foreigner, must be supposed to submit himself to the same laws, unless he has taken care to stipulate for a performance in some other country, or has in some other way excepted his particular contract from the laws of the country where he is."

We consider this doctrine so clear upon principle, and so firmly established by authorities, that it is not necessary to review the series of authorities which might be cited to sustain it.

II. But there is another question more difficult and important, necessary to be considered in determining the present case, affecting the satisfaction and discharge of a contract by any thing short of an actual performance of the thing stipulated to be done. As to the law regulating remedies, it is as clearly settled, and upon most satisfactory grounds, that every case must be governed by the law of the place where the remedy is sought. What species of process a creditor may have by arrest of the person, attachment or sequestration of real or personal property, the time, place, and manner in which, and the tribunal before whom, suit may be brought, are all regulated by the *lex fori*. The time within which an action may be brought, with all exceptions and qualifications, falls under the same head, which must, of course, include all statutes of limitation. But there is a large class of cases falling under neither of these extremes, that is, not depending on construction or interpretation, and still not affecting the mere matter of remedy. We allude to the numerous laws regulating

the execution and performance of contracts, where an exact and specific performance becomes impossible; what shall be deemed and taken to be a good substituted performance, or what shall be the nature and the measure of compensation where the contract is not performed? Indeed, there are few cases where the law can enforce a precise and specific performance of the very thing stipulated to be done; and where it cannot, what law shall determine the equivalent, measure of damages, or substituted performance? Even under the mere law of nature, such cases must occur. An Indian hunter has agreed with another to deliver a given number of carcasses of venison, after the hunting season; but the deer have been all driven away or have perished by disease, and the venison cannot be obtained. But the debtor has been successful in fishing, and has an abundant supply; what, then, does the law of natural justice require him to do, in the performance of his contract? Is it not to deliver to his creditor a quantity of fish equally valuable and useful with the promised venison? And will not the same law regard this as a reasonable satisfaction? In a further advanced stage of civilization, a farmer has stipulated to deliver to a trader a fixed number of bushels of wheat, at harvest, and the wheat is blighted and the harvest fails; what laws shall decide what sum of money, or what amount of other produce, the farmer shall deliver as an equivalent? In the early history of Virginia, contracts were made generally to pay in tobacco. Suppose there was a law of the place that, upon the failure of the crop of tobacco, a given number of bushels of corn should be deemed equivalent to a given number of pounds of tobacco, and should be received as a substitute; would not this law regulate such a contract, either as a tacit condition annexed to it by the parties, or because it was a law to which the parties both owed obedience, and subject to which they must have been presumed to contract?

It appears to us that these laws, affecting, as they do, the nature and character, the force and obligation of the contract, deciding to what extent it binds the parties in all the various contingencies which may occur, what shall be deemed actual

and specific performance, or qualified and substituted performance, or satisfaction for non-performance, are all incidents of the contract.    They are not to be governed by the law which affords judicial remedies, legal or equitable, but are to be governed by the law of the contract, whether it be the law where the contract is made, or where by its terms or legal effect it is to be performed.

We again recur to the language of Chief Justice Parker in the case of *Blanchard* v. *Russell*.    After remarking that we must look beyond the law regulating the interpretation of a contract to find the grounds upon which it may be discharged, he says : " We think it may be assumed as a rule affecting all personal contracts, [made by the subject of one country in another,] that they are subject to all the consequences attached to contracts of a similar nature by the laws of the country where they are made, if the contracting party is a subject of, or resident in that country where it is entered into, and no provision is introduced to refer it to the laws of any other country."    He then puts, by way of illustration, the precise case now before us, as follows :    " Thus, if an American merchant becomes the creditor of an English merchant in England, and the English merchant becomes bankrupt, and obtains a certificate of discharge, the American merchant will be concluded by such certificate ; for it is reasonable to suppose that both parties knew of the existence of the bankrupt laws of England, and the contract must be presumed to have been made with reference to those laws.    Indeed merchants doing business abroad are always supposed conusant of the laws of the place where they transact their business, and to submit themselves to such laws, and even to such customs as are found there to exist."

The case thus put is directly in point, so far as the question turns upon what may be regarded as the international law upon this subject, as it operates upon contracts, and governs the administration of the laws, between sovereign states.    So far as that case turned upon the effect of an insolvent law of one of the United States, acting under the restrictions imposed upon state legislation by the constitution of the United

States, its authority has been shaken by subsequent decisions.

We perceive, also, in this case, the ground upon which the principle is founded. It is this, that the law of the place of the contract, which may be called the law of the contract, gives it its character, makes it what it is, fixes its limits and obligation, fixing the time when it shall commence, how it shall be executed or satisfied, and how it shall be terminated and discharged. When, therefore, such a contract is discharged, by force of the same law which gave it its origin and effect, it is extinguished, and no longer exists as a contract. When, therefore, a remedy is sought upon it in the tribunals of another country, the same international comity, which permits the creditor to demand damages for its non-performance, ought to permit the defendant to show that the obligation no longer exists. The law under which such discharge is obtained can hardly be said, in such case, to have an extra-territorial operation; it operates within the country where the contract was made, in fixing its character and legal effect, which, upon the happening of the contemplated contingency, puts an end alike to its obligation and to its execution.

All sovereign states have authority to regulate their own currency. Suppose the English government, after a debt contracted in England by an Englishman with an American, had passed a law reducing the currency, or increasing the nominal value of gold, so that the number of pounds sterling contracted for could be paid by a less weight of gold, and the American creditor, under protest, and because he could not do otherwise, should receive his debt in the reduced currency, on finding his debtor here, could he sue him and recover the deficiency? We think not; the contract would have been fully satisfied, according to the law of the place of its creation, and of course would be at an end. If, indeed, a law should be passed manifestly fraudulent and colorable in this respect, courts of another country, not bound absolutely by the laws of such country, operating *proprio vigore*, but so far only as comity requires, may refuse to carry such unjust law into effect. So, where an insolvent law is so framed as in

effect and in practice to exclude foreign creditors from avail-
ing themselves of the benefit of it, they shall not be bound
by it. *Prentiss* v. *Savage*, 13 Mass. 20.

We are of opinion, that the weight of authority is in favor
of the position, that the discharge of a contract by the law of the
country in which it was made and to be performed, by a law
providing for the appropriation of all one's property for the
payment of all his debts, and if insufficient, for an equal dis
tribution, must be considered as determining the contract by
the same species of force by which it was formed, *eo ligamine
quo ligatur*, and, therefore, that it no longer exists.  I shall
not now review the authorities critically, but only refer to
a few of the leading cases.  It seems to be conceded by the
learned and copious arguments of the plaintiffs, that the Eng-
lish authorities are to this effect.  Among the most prominent
are *Ballantine* v. *Golding*, 1 Cooke B. L. (8th ed.) 487 ; *Pot-
ter* v. *Brown*, 5 East, 124 ; *Smith* v. *Buchanan*, 1 East, 6 ;
Story Confl. § 340.  We are of opinion that the weight of
American authority is the same way.  *Mather* v. *Bush*, 16
Johns. 233.  In this case it was held, that the obligation of
a contract is affected by the law of the place where it is
made ; and that, as a consequence, that law, by determin-
ing its legal effect, determines the obligation.  It is placed on
the ground, that the law of the place of the contract, when
it is made and to be performed in such country, not only
creates and gives effect to the obligation and duty imposed
by it, but determines by what act it shall be deemed paid,
satisfied, released, discharged or extinguished.  Chancellor
Kent's decision, in *Hicks* v. *Hotchkiss*, 7 Johns. Ch. 297, is a
clear decision that, where the case is not affected by the con-
stitution of the United States, a discharge under a bankrupt
law, legally granted, in the state or country in which the con-
tract is made and to be executed, such law having existed
and been in force when the contract was made, extinguishes
the contract.  "A contract cannot," says the learned judge,
(p. 308,) " create a civil obligation in a mode not permitted,
and to an extent beyond that prescribed by the established
law of the land, existing when the contract is made."  In a

very recent case, in Maine, *Very* v. *McHenry*, 16 Shep. 206, the same principle is affirmed and adopted.

Without going into a more extended review of the decisions of state courts, we are of opinion, that this decision is not opposed by the authority of the supreme court of the United States, as stated in the leading and most elaborate case of *Ogden* v. *Saunders*, 12 Wheat. 213. It was most ably and fully argued by eminent counsel; it was argued several times, not only with the keenest legal discrimination, but with the closest metaphysical acumen, and every argument brought to bear which could be supposed to have any effect on the question. But, after all, the question turned upon the effect of a discharge under an insolvent or bankrupt law subsisting in one state in respect to a contract made in that state, and to be performed there, of which state both parties were citizens at the time the discharge was obtained, but where the discharge was pleaded and relied upon, as a defence to a suit brought on such contract in the circuit court of the United States, sitting in another state. We think it was discussed and decided upon principles growing out of the relations subsisting between the governments of the several states and that of the United States, and the relative powers of each; the limited powers of sovereignty of the respective states, with an unlimited power of legislation over certain subjects, and the absolute power vested in the government of the United States over other subjects; the latter being supreme to the extent to which it is conferred. It turned, therefore, upon the terms and construction of the constitution, distributing these powers of legislation and government, and imposing an express limitation upon the legislation of the several states upon certain subjects. There was an extraordinary conflict of opinion amongst the judges who decided the case. They all were of opinion, that, notwithstanding the constitution of the United States authorizes the general government to pass a uniform bankrupt law, yet that the several states still had the power to pass an insolvent law, so far as it could be done, without coming in conflict with the provisions of the constitution, or the laws actually made by

congress in pursuance thereof. The question was, as to the nature and limits of such power, and the objects and purposes to which it might extend. When a uniform system of bankruptcy, under a law of the United States, is actually in force, to the extent to which it reaches it must of necessity suspend state laws, because they would be repugnant. If it extended to merchants only, the states might make laws of insolvency in respect to other classes of debtors; and so in regard to all subjects and persons not reached by the United States bankrupt law. Three judges were of opinion, that the law in force where a contract is made, gives character and effect to the contract, either as tacitly referred to by the parties, or as accompanying and governing the contract; that such a law, providing how, on certain contingencies, it should cease and become inoperative, as upon his becoming insolvent and surrendering his property, would affect the contract itself, and, therefore, if this were discharged by force of the same law by which it was created, the discharge would put an end to the contract, and be available ever after as a defence, in whatever state the creditor might seek to enforce it; and that the discharge in the case then in judgment was a bar. Three judges were of opinion, considering the relations amongst the several states when the constitution was adopted, the purpose to establish a more perfect union, to provide a more general and controlling system of distributive justice, in the great relations of debtor and creditor, over the whole union, and that an insolvent law of each state could not, *proprio vigore,* operate extra-territorially, and thus accomplish the great purpose of uniformity contemplated, that, when the constitution of the United States provided for establishing a uniform bankrupt law, and at the same time prohibited the states from making any law impairing the obligation of contracts, the effect was to restrain the states respectively from passing any law which would forever, and under all circumstances, exonerate one from further liability on his contracts; and, therefore, that a state insolvent law, purporting to give such a discharge, was unconstitutional and void, when attempted to be enforced beyond the limits of such state.

One judge was of opinion, that such insolvent or bankrupt law was constitutional and valid, yet affected the remedy only, and not the contract, and therefore afforded no defence to a suit brought in another state, or in the courts of the United States. Four judges ultimately united in holding the discharge in that case void.

The result, we think, is not opposed to the decision in this case, upon the effect and operation of the bankrupt law of England, on a contract made and to be executed there, and discharged by the operation of an act of parliament existing when the contract was entered into, and having the full force over the persons contracting, to the extent to which any law could affect the contract. The case of *Ogden* v. *Saunders* affected only the discharge obtained under a law of a state with limited powers, and in that case some of the judges held that the general power was expressly restrained. It seems to us that, could the law have been regarded as general and unrestrained by the constitution of the United States, they would have concurred in the opinion that the discharge would have been valid.

III. It is then argued, that such cannot be the rule, because the assignee of a foreign bankrupt cannot come here and claim the property and choses in action of the bankrupt. We have been strongly pressed by the argument that, inasmuch as assignees of an English bankrupt cannot sue for and recover debts due the bankrupt, therefore the bankrupt law has no extraterritorial operation, and cannot give effect to a certificate of discharge, when set up here in bar by an English bankrupt. But we cannot perceive the force of this reasoning. The two things are not irreconcilable; they stand on different grounds, and depend on different and distinct principles. Though the point has been long doubted, we consider it as now settled by a preponderance of authority, that, when a debt due by an American merchant to an English bankrupt is attached by an American creditor of the English bankrupt, by a trustee process, or process of foreign attachment, the assignees of the English bankrupt cannot come in and interpose such assignment to defeat such attachment, and claim the

4*

assets as by a prior title. *Le Chevalier* v. *Lynch*, 1 Doug. 170; *Blake* v. *Williams*, 6 Pick. 286; *Holmes* v. *Remsen*, 4 Johns. Ch. 460, and 20 Johns. 229; 2 Kent, Com. 405. But this is the extent to which the authorities go. It by no means follows, that the English bankrupt law has no effect here. On the contrary, we think it would enable the assignees to take possession of, and appropriate to the use of the creditors, personal property not attached or .otherwise subject to any lien under our laws, and also to collect and receive all moneys due the bankrupt, and give a good discharge therefor, and sue for and recover them, either in their own name or in the name of the bankrupt, if not attached or held by any process or lien, by any other creditor. It was so admitted, we think, by implication and in effect, in *Blake* v. *Williams*. Our law recognizes the rule that rights to personal property, including debts, are to be disposed of according to the law of the domicil of the owner, as well *inter vivos*, as in case of the owner's decease; but as this law can operate beyond the country of the owner only by comity, it is taken with this limitation, that it shall not operate injuriously to the citizens of the state, whose laws are invoked to carry it into effect. *Dawes* v. *Head*, 3 Pick. 128; *Blake* v. *Williams*, 6 Pick. 286. So the title of the assignees, both to personal property and choses in action, is recognized and admitted, so far as it can be without affecting injuriously the claims of domestic creditors. But then comes in another well established principle, that every government may by positive law regulate and direct as it pleases all personal property found within its jurisdiction; and may therefore prefer its own attaching creditors to the claims of any foreign assignee, and no other state has authority to question its determination.

In the opinion of Chancellor Kent, in the case of *Holmes* v. *Remsen*, 4 Johns. Ch. 460, he remarks upon the apparent inconsistency in practice, on this subject, as it has been alleged, which will give effect to the assignment, and not give effect to the certificate. But admitting that there is a want of harmony in this respect, he adds, " it will not affect the binding force of the rules taken separately." And we think

the obvious reason is, that they are drawn from separate sources, and the admission or rejection of the one does not involve the admission or rejection of the other. Considering, therefore, what the weight of authority now is, to which chancellor Kent, contrary to his opinion in *Holmes* v. *Remsen*, now assents, (2 Kent Com. 405,) that the assignee of a foreign bankrupt will not have a right to defeat the attachment of a domestic creditor, made in conformity with the laws of his own state, it is founded on the principle, that the foreign assignee can claim to sue here, not by positive law, but by comity only, and that this comity will not be yielded when it would tend to injure the citizens of the state where the remedy is sought, and that every state has both the right and the power to control and regulate personal property found within its limits; and having given such rights to its own citizens, they shall not be taken away by the application of the principle of comity. This principle is entirely distinct from that which gives effect to the certificate of discharge of a bankrupt, against a debt contracted in the country of the bankrupt, and to be executed there.

IV. It is objected to the admission of this certificate, under the principle of comity, that the English bankrupt law is unequal and unjust. It is said to be unequal, because it gives a preference to certain debts due the crown, to be paid in full. To this, there are two answers: First, this principle, of the priority of a public debt, is common to all bankrupt and insolvent laws, also in case of deceased insolvents; and, secondly, foreign creditors are put on the same footing of equality with English creditors. It is then said, that the law is unjust in giving a discharge of the entire debt without full payment. The first answer is, that it provides for the payment of the debts in full, if the funds are sufficient for that purpose. If they are not paid in full, it is because it is impossible. *Ad impossibilia lex non cogit.* It is amongst the contingencies known when a debt is contracted, that the debtor may be unable to pay it, and in that event, full payment is not to be expected. The whole effect of the law then is, (for it takes all the debtor's property,) to except his

future earnings and acquisitions. But this is only on con-
dition that he will surrender all his property, and faithfully
coöperate with his creditors, to pay as far as possible. Taken
as a system, it may well be maintained that such a system
is favorable to creditors, and affords them the best means
of obtaining satisfaction. Especially is this beneficial to
foreign creditors, who, not being on the spot, cannot use the
same diligence to collect their debts as domestic creditors.

It is said the constitution of the United States holds it im-
moral, because such a law impairs the obligation of con-
tracts. Even as expounded by a majority of the judges, in
the case of *Ogden* v. *Saunders,* the power is, for wise pur-
poses, prohibited to the respective states; but it *is* in terms
given to the United States, and no doubt, because, being uni-
form over all the states, it would be more extensive in its
operation, and of course more beneficial. The constitution
could not grant in one clause, a power, the exercise of which
is denounced as unjust in another.

.                    *Judgment for the defendants.*

---

THE other case, of *Norris* v. *Breed,* was an action on a bill
of exchange for £400, dated May 11, 1839, drawn by the de-
fendants, and payable to the order of S. H. Norris, Esq.; and
was submitted to the court upon a statement of facts similar
to that in *May* v. *Breed,* but with this additional fact, that
Norris proved his claim on this bill against the estate of the
defendants in bankruptcy, and received two dividends from
their assignees, one of two shillings in the pound, and the
other of four pence.

*S. E. Sewall,* for the plaintiff.

Norris, by proving his debt and receiving a dividend, gave
no assent to the discharge. The English bankrupt law does
not contain the provision which our insolvent law does, dis-
charging all debts proved. He did not prove voluntarily, but,
as it were, by compulsion, to secure a fragment of his debt.
It is true that the law undertakes to discharge all debts which

might have been proved under it. But it can have no extraterritorial operation; and the plaintiff's assent, if it exists, can amount only to a promise that he will not dispute the discharge in the English courts. He does not give any operation to the English law that it would not otherwise have. *Norton* v. *Cook*, 9 Conn. 314; *Hammett* v. *Anderson*, 3 Conn. 304; *Kimberly* v. *Ely*, 6 Pick. 440; *Agnew* v. *Platt*, 15 Pick. 417, 422; *Phillips* v. *Allan*, 8 B. & C. 477; *Bissell* v. *Briggs*, 9 Mass. 462; 10 Touillier Droit Civil, 121, 123. *Tebbetts's Case*, 5 Law Rep. 259, 265, was on a question of the construction of the United States bankrupt act. But this is not a question on the construction of a statute, but on a principle of international law.

*C. G. Loring* and *W. Dehon*, for the defendants.

The plaintiff, by proving his claim, and receiving a dividend, adopted the remedy provided by the law of the place of the contract, and applied it to the contract, so that it is satisfied and discharged. If he had by virtue of his residence here, any extraterritorial immunity, he has waived it, and has voluntarily become a party to the proceedings in bankruptcy, and has submitted himself and his contract to their jurisdiction. He cannot avail himself of the law for one purpose, and repudiate it for another. It would be a fraud on the other creditors, to go in and take a part of the funds from them, unless he takes it upon the same terms with them. *Phillips* v. *Allan*, 8 B. & C. 477; *Harrison* v. *Sterry*, 5 Cranch, 289, 299; *Woodhull* v. *Wagner*, Bald. 296, 301; *McMenomy* v. *Murray*, 3 Johns. Ch. 435, 440; *Clay* v. *Smith*, 3 Pet. 411; *Van Hook* v. *Whitlock*, 26 Wend. 43; *Chapman* v. *Forsyth*, 2 How. 202; *Cook* v. *Moffatt*, 5 How. 295, 299; *Morse* v. *Lowell*, 7 Met. 152; *Fisher* v. *Currier*, 7 Met. 424; *Gilbert* v. *Hebard*, 8 Met. 129, 132.

SHAW, C. J. The certificate of discharge, being held a good defence where the American creditor had not proved his debt, *a fortiori* is it so against a creditor who has proved his debt and taken dividends.